**Charles DAVIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–83–00107–CR.**

Court of Appeals of Texas, San Antonio.

July 25, 1984.

---

David R. Weiner, San Antonio, for appellant.

Sam Millsap, Jr., Ed Springer, Tom McHugh, Linda C. Anderson, Criminal Dist. Atty., San Antonio, for appellee.

Before ESQUIVEL, BUTTS and DIAL, JJ.

## OPINION

ESQUIVEL, Justice.

This is an appeal from a conviction for the offense of murder. The jury found appellant guilty of the offense as charged in the indictment. The court assessed punishment at twenty-five (25) years' confinement.

In his sole ground of error appellant contends that the evidence is insufficient to corroborate the accomplice testimony used to convict him. We reverse.

The jury was instructed on the law of parties under TEX.PENAL CODE ANN. § 7.01 (Vernon 1974), and on the law of criminal responsibility for the conduct of another under TEX.PENAL CODE ANN. §§ 7.02(a)(2) & (b) (Vernon 1974).

The trial court in its application charge instructed the jury that Troy McCullough, Jr., was an accomplice witness as a matter of law; that a conviction could not be had upon the testimony of an accomplice unless that testimony was corroborated by other evidence tending to connect appellant with the offense committed; and that the corroboration was not sufficient if it merely showed the commission of the offense.

It is well settled that the test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witnesses, and then to examine the evidence of the nonaccomplice witnesses to ascertain if it is of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient, otherwise it is not. *Pinson v. State*, 598 S.W.2d 299, 302 (Tex. Crim.App.1980); *Shannon v. State*, 567 S.W.2d 510, 513 (Tex.Crim.App.1978); *Brown v. State*, 561 S.W.2d 484, 487 (Tex. Crim.App.1978); *Gordon v. State*, 640 S.W.2d 743, 757 (Tex.App.—San Antonio 1982, no pet.). However, the corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Lyman v. State*, 540 S.W.2d 711, 714 (Tex.Crim.App.1976); *Bentley v. State*, 520 S.W.2d 390, 393 (Tex. Crim.App.1975). The corroboration evidence need only make the accomplice's testimony more likely than not to be true. *James v. State*, 538 S.W.2d 414, 416 (Tex. Crim.App.1976). Further, it is not necessary that an accomplice be corroborated on all of his testimony. *Shannon*, 567 S.W.2d at 513.

Troy McCullough, Jr., was the principal witness for the State. He admitted pleading guilty to the charge of murder and having murdered William Johnson on June 6, 1982. His testimony was as follows. On the night of the murder he and appellant were together. They were walking to appellant's house to meet his sister. On the way to appellant's house he unsuccessfully attempted to steal a bicycle from the yard of a house while appellant kept watch. After they continued on their way appellant showed him a house where they "could make some money." Appellant told him

that a man lived there by himself and that the man could not see or hear. They both entered the yard, which was enclosed with a chain link fence and approached the house. He removed a screen from the bathroom window and leaned it against the fence some distance from the window. Appellant opened the window for him and placed a paint bucket under the window for him to climb into the window. He entered the house through the window and remained in the house for about ten minutes. While in the house he killed William Johnson in the bedroom by beating him with his fists. Appellant did not enter the house with him and "he didn't have nothing to do with it." After he killed Johnson, he took the lawn mower from the kitchen and left the premises through the front door. He sold the lawn mower to a passerby and used the money to buy fried chicken. He further testified that he gave a written statement to the police on the day that he was arrested, and that he lied when he told the officers in the statement that appellant, whom he referred to as "Red" in the statement, went into the Johnson house with him on the night of the murder.

The witness Mary E. Johnson, daughter-in-law of the deceased, testified that she found the deceased in his bed at approximately 2:15 p.m. on Sunday, June 6, 1982. He appeared to have been beaten. She went home, got her husband and they returned immediately to the house. They determined that the deceased was dead. She noticed the front and back doors to the house were open. She discovered the lawn mower was missing and noticed that entry to the house was through the open bathroom window. The screen had been removed from the window and she noticed it leaning up against the fence. She also noticed a bucket under the open bathroom window.

Officer Ben Burleson testified that he was dispatched to the scene around 3:00 p.m. He found the deceased lying in bed; he observed the open bathroom window and a bucket under the window. The screen to the window was leaning up against the fence.

Detective John D. Rivas of the Murder Evidence Collection Unit testified he found no fingerprints at the scene the next day.

Juan Perez testified that he lived across the street from the deceased and identified appellant as the person he had observed cut the grass at the deceased's house approximately one month prior to the deceased's death.

Detective Al Phillipus testified that he arrested appellant and took two statements from appellant on June 17, 1982. The record reflects that these statements were introduced into evidence by appellant at trial. The pertinent parts of the first statement taken on that day at 1:35 p.m. read as follows:

I would like to state that on Saturday, June 5, 1982, at approximately 11:00 P.M., I was sitting with a friend of mine, George Albert Martinez. I would like to correct to say that his name is George Albert Mendez. We were sitting on his back porch, located in the Lincoln Courts, when a guy I know as Troy McCullough came walking up. Troy told me he knew George who had walked inside when he saw Troy walking up. George called me inside where he told me he didn't want Troy there. Troy began calling me from the porch so I told George I would go ahead and leave with Troy to get Troy away from the house. When I went back outside Troy told me that he wanted to meet my sister, Judy Brown, who lives in an apartment on Ashby. We began walking down the tracks towards Ashby St. Troy had showed me some money while we were at George's house but stated that he needed some more money. We left the tracks when we got to Fulton and began walking east, going past some of the side streets. We passed in front of a white colored house about one block from the old mans [sic] house, I am not sure what street we were on. Troy saw a bicycle in a driveway leaning against a house. Troy told me that he was going to get the bike. He began walking towards the bike and had just gotten to it

when a light came on from the house. A lady walked out on the porch and asked Troy what he was doing. Troy asked her if someone was there, I am not sure who. I believe he made the name up. I didn't hear what the lady told him because I was walking away from the house. Troy caught up with me and told me that he almost had the bike. We continued walking towards my house. Troy stopped me and turned up an alley which runs behind the old mans [sic] house and we began walking towards Blanco Rd. When we got to the back of the old mans [sic] house I told Troy that I had done the old mans [sic] yard before. He asked me who lived there and if he lived by himself. I told him the old man lived there alone. Troy jumped the fence into the yard and told me to wait for him. I watched Troy stop at the corner of the house where he took a shit. After he finished he went to one of the middle windows on the east side of the house and began knocking on the window. No one answered so Troy went to the rear of the house where he picked up a bucket, I think it was white, if I'm not mistaken. Troy placed the bucket just under the window. No wait, he tore the screen off of the window and laid it down somewhere, I'm not sure where. Then he got up on the bucket and crawled through the window. I saw Troy halfway through the window and got scared so I ran off going through the alley towards Blanco Rd. After I left I don't know what happened. I went to my house and went to bed. It was about 2:30 A.M. when I got home. I believe it was approximately 2:00 A.M. when we reached the old mans [sic] house. I have read the above statement and it is all true and correct to the best of my knowledge. END OF STATEMENT.

The pertinent parts of the second statement taken at 3:08 p.m. on the same date read as follows:

I would like to continue my voluntary statement because I have left out a few details about what happened while we were in the alley. I would like to say that while Troy and I were walking up the alley, Troy said to me "Say Red, I need some money. Its about time for people to get their Social Security checks, isn't it". I said yes that my mother had already gotten hers. Troy then stated, "Man, I'd do anything to get some money, madn [sic], you know me, I don't care". I think he meant that he didn't care what he had to do to get it. We were coming up to the old mans [sic] house, I think his name was Marvin Johnson, and I told Troy that I had cut this old mans [sic] yard before. I pointed to the house. Troy told me, "Hey Red, you know me, I always make money". Troy was drunk and was acting very crazy. About this time we were right behind the old mans [sic] house. He told me "Man, you know me, I don't take nothing off of no body". Troy jumped over the fence into the old mans [sic] back yard and walked towards the house. There were no lights on in the house. I watched Troy go up to the corner of the house where he took a shit. After he finished, no wait, I was thinking that it was funny because Troy didn't have any toilet paper. He finished shitting and walked to the window on the side of the house where he began knocking on the window. No one answered so Troy began removing the screen which he laid down somewhere. He then climbed up on the bucket which he had gotten from the rear of the house and began crawling through the window. When he was halfway through he yelled at me, "Hey, Red, come on man". He was tlking [sic] very loud and making a lot of noise. I became afraid because I thought Troy was going into the house to rob the old man. I then ran home as previously stated. The last time that I saw Troy he was going through the window on the side of the old mans [sic] house. I have not seen Troy since that night and I did not know the old man was dead until Detective Philippus told me about it a couple of days ago. I have read the above statement and it is all true and correct to the

best of my knowledge. END OF STATEMENT.

■ We have given the statement of facts a most thorough investigation and we conclude therefrom that Troy McCullough makes out a clear case of murder against appellant; that McCullough was corroborated by the testimony of other witnesses, including appellant himself, as to a number of facts sworn by him, but no witness in this case except Troy McCullough, Jr., swears to a fact tending even remotely to incriminate this appellant in the murder of Johnson. Accordingly, we hold that there is no proof in the record independent of the accomplice's testimony tending to connect appellant with the commission of the offense charged.

The judgment is reversed and the cause is remanded to the trial court with instructions to dismiss the indictment. *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).