**Terry D. REED, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 64984.**

Court of Criminal Appeals of Texas,
En Banc.

Jan. 20, 1988.

Don R. Wilson, Abilene, for appellant.

Patricia A. Elliott, Dist. Atty., Abilene, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction of murder. V.T.C.A., Penal Code, § 19.02. Trial was by jury, and after finding appellant guilty of murder, the jury assessed punishment at eight years' confinement in the Texas Department of Corrections.

In a single point of error (nee ground) appellant alleges that the trial court erred in rendering a judgment of conviction against appellant, because the non-accomplice evidence was insufficient to corroborate the testimony of the accomplice witness. See Article 38.14, V.A.C.C.P. Since appellant alleges insufficiency of the evidence we will review the facts as set forth in a voluminous record comprising over 2700 pages of testimony and exhibits to determine whether sufficient corroborative evidence was adduced to sustain the conviction.

The two count indictment alleges in relevant part that appellant on or about May 20, 1978, in Taylor County "did then and there unlawfully, intentionally and knowingly cause the death of an individual, Marsha Jeanette Reed, by strangling her with his hands, . . ." and "by strangling her by stuffing a washcloth into her mouth." The deceased was appellant's wife.

Out of the jury's presence a hearing was conducted to determine whether the accomplice witness, Howard T. Hill should be allowed to testify at appellant's trial. At this time Hill had not been granted immunity by the State. However, a plea bargain was reached and as a result Hill agreed to testify in exchange for a five year prison sentence. The trial court agreed to follow the plea bargain and found Hill guilty of the offense of murder. The court assessed punishment at five years' imprisonment.

Hill testified at appellant's trial that he came to Texas from Wyoming in March 1978, after "a very bitter divorce." He met appellant while working at the Texas Truck and Frame Company in Abilene.

Hill stated that around May 1, 1978, he was in need of money to pay rent and he approached appellant to obtain a $200 loan. Although appellant agreed to make the loan at a later date, he suggested Hill could "earn" the money by staging a "robbery" of appellant's house. Appellant explained that if Hill stole a few items from his house, appellant could collect some insurance money and pay Hill $200.[1] Hill initially declined the offer, but approximately one week later he agreed to participate in the scheme.

Approximately one week before Marsha Reed's death, Hill visited appellant's home and discussed the details of the "burglary." Appellant showed Hill around the house, pointed out where the guns, TV, stereo, and jewelry boxes were located, and told Hill he would leave the back door unlocked. Appellant also agreed to let his dogs run free on the night of the burglary. According to Hill, the burglary was to occur on the first weekend in June. However, on May 19, 1978, appellant approached Hill at work and said the burglary would have to take place that night. Appellant told Hill that he and his wife would go out around 6:00 or 7:00 p.m., and that he wanted Hill to come to the house between 10:00 and 10:30 p.m. The agreed upon signals for Hill to proceed with the "burglary" included a light turned on in the living room and an open gate in the back yard.

On the agreed upon date Hill left work and went to the Green Dragon Club with a co-worker named Phil Mitchell. They arrived at the club around 6:30 p.m., and Hill stayed until approximately 9:45 p.m. At that time Hill told Mitchell he "had some business to take care of" and left. However, Hill's blue Mustang, which he had borrowed from his grandfather in Cisco, would not start and Mitchell had to help "push it off." Hill left the premises accompanied by an unidentified female who needed a ride. This testimony was fully corrob-

---

1. Raymond Fletcher, an insurance agent, testified that his company handled the mortgage loan on appellant's residence. Appellant's poli-cy did not cover articles stolen during a burglary.

orated by Mitchell, who testified that he knew Hill as "J.D. Hunter."[2]

After dropping off the female passenger Hill had difficulty locating appellant's house and decided to stop at a convenience store to ask directions. One of the customers, Billy Bilbrey, testified that Hill asked him for directions to the 1800 or 1900 block of Anderson Lane. Bilbrey referred Hill to a friend waiting outside the store, who agreed to lead Hill to Anderson Lane. Hill followed Bilbrey and his friend, James Stabler, and their wives to the intersection of Anderson and Old Anson Road, where Hill had to make a U-turn to return to appellant's house. Stabler estimated that the time was between 9:00 and 10:00 p.m. Stabler's wife, Julie, identified Hill and the blue Mustang. She also reported the incident to the police after hearing about Marsha Reed's murder.

Hill drove past appellant's house and noticed that the back gate was open and that the light was on, according to the plan. Hill noted that it was "right at 10:30 or quarter to 11:00" when he took another drive around the block before parking behind a church at the end of the block. Hill walked down an alley to the back of appellant's house and entered the house through the unlocked back door. Hill took an 8 millimeter rifle, a shotgun, a sword, and a .22 caliber pistol back to his car and placed the items in the trunk. Hill returned to the house and took the jewelry boxes, a knife, a camera, a base station CB, and a mobile unit CB. Hill testified that he left the TVs and stereos, because appellant had indicated that he would help carry them out later.

Hill left appellant's house and returned to the Green Dragon Club. Phil Mitchell was still at the club when Hill returned, and he estimated that Hill had been gone "something over an hour." According to Mitchell, Hill seemed "moody" and "mad." Mitchell recalled that Hill left the club by himself around 11:30 p.m., just as the last call for drinks was made. Hill himself

testified that he left the club for the second time "right at twenty after 11:00."

Hill returned to appellant's house around 11:40 p.m. and again parked in the alley way, this time closer to the house beside an abandoned vehicle. He testified that the reason for returning was to pick up "the bigger things," according to appellant's instructions. Hill reentered the empty house and waited for appellant's arrival. According to Hill, appellant and his wife returned "just before midnight." Appellant unlocked the front door and held the door for Marsha. He then told Marsha to get the baby's things ready, and placed the child on the living room couch. Hill stated appellant "appeared angry." While Marsha went to the baby's room, appellant handed Hill a cardboard box containing sexual paraphernalia and magazines, and ordered him to "get this out of the house."

Hill proceeded out the back door and was standing on the patio when he heard Marsha scream. Hill dropped the box and ran back into the house. From the entrance of the hallway Hill heard "scuffling" sounds coming from the baby's room, and when he peered in he saw the following:

"A  I seen Terry was pretty much on top of his wife beating on her with his fist.

"Q  Describe—show the Jury what you saw.

"A  Well, she came in and he was holding her with one hand and hitting her with the other.

"Q  Which hand was he hitting her with?

"A  The right hand.

"Q  All right. What was Marsha's position at that time?

"A  She was flat on her back in the baby's room.

"Q  Was she on the floor?

"A  Yes, she was.

"Q  And what was Terry's position?

"A  He was kneeling over her.

"Q  Was he straddled over her?

**2.** Hill later explained the origin of his alias: "J.D. because of the drink I drank and some iron worker buddies gave it to me. Hunter

came from my hunting partner because I'm a bow hunter and he always called me the Hunter."

"A    Yes, he was.  It looked like her left arm was pinned by his knee.

"Q    All right.  And he was striking her with his right fist?

"A    Yes.

"Q    And where was he striking her?

"A    In the face."

Hill noticed that Marsha was grabbing appellant's hair with her right hand, and appellant instructed him to "get her hand." Hill freed Marsha's hand and left the bedroom after appellant ordered him to "get the hell out of here."[3]

Hill testified that he went to sit on the couch by the baby and then heard appellant "breathing real hard." Hill walked back to the entrance of the baby's room and saw appellant pulling on a belt placed around Marsha's throat. Hill noticed that she was not fighting at all, and went back to sit on the couch. At this point, appellant called to Hill and told him he would need his help in disposing of the body. Hill initially refused, but agreed to help when appellant threatened to "hang the whole thing on" him. Appellant then instructed Hill to ransack the master bedroom.

According to Hill, appellant "came into the bedroom and he told me we would have to make it look good, as if he had been beat up, like somebody was robbing the house and they walked in and they killed Marsha and beat him." Appellant next ripped the blue pullover shirt he was wearing off his back and threw it into the baby's room. Hill stated that appellant was in the hallway facing the kitchen when he ripped the shirt off. A button that had popped off appellant's shirt was found by Jack Dieken, an Abilene Police Lieutenant, in the hallway near the threshold of the kitchen.

Appellant used a kitchen knife to cut the back screen door just above the latch. Hill testified that neither he nor appellant put his hand through the screen.

Appellant also got Hill to stage a mock fight to make it look like a real struggle had taken place. Hill hit appellant twice, once in the left cheek with his right fist and once in the chin with his left hand. However, appellant stopped him, saying: "Well, forget that, I'll make it look right."

The next thing that Hill heard was the sound of "clothes ripping." He stepped into the baby's room and saw appellant ripping the clothes off Marsha's body. Hill noticed that she had a pink wash cloth in her mouth, and that her head was wrapped in a towel. Appellant ordered Hill to "help me put her in the blanket," and together they "put her in the blanket and then [appellant] stuffed [her] clothes in it and folded it over." The body was carried out the back door and dragged through the field to Hill's car in the alley. While the men were carrying the body through appellant's yard, Hill noted that a car pulled into the driveway of the house located on the east side of appellant's residence. After a few minutes the car drove away and Hill and appellant "kind of half dragged and half carried" the body to the car. According to Hill, "we put the body in the back seat of my grandfather's Mustang."

Appellant instructed Hill to drive to an isolated location on the east access road of Highway 277. At the top of a hill appellant told Hill to stop and appellant, who had gotten into the back seat, opened the passenger door and threw the body out "face first." Hill later testified that appellant bumped his head on the window frame of the car, causing a bump on the right side of his forehead along the hairline. Hill dropped appellant off in the alley behind his house between 12:30 and 1:00 am. Before departing appellant gave Hill his wallet and Marsha's purse.

---

**3.** Dr. Irving Stone, chief of the physical evidence section at the Dallas Crime Lab, examined the strands of hair recovered from the baby's bedroom and determined them to be "the *same in all observable characteristics as the* sample of head hair I got from Howard T. Hill." Although Dr. Stone could not state with absolute certainty that the hair came from Hill's scalp, he was positive that it did not come from either the victim or the appellant. He further noted that the strands had been "forcibly removed" from the scalp, because they still had tissue particles clinging to the roots.

On cross-examination Dr. Stone added that the likelihood of the hair sample coming from any one other than Hill was "extremely remote."

Hill stated that after he dropped appellant off he left Abilene headed for Cisco. Along the way he stopped at a roadside park approximately ten miles outside of town to get rid of the contents of the large jewelry box, Marsha's purse, and various items stuffed into a sack. He stated that it took "forty-five minutes to an hour, maybe an hour and a half" to complete this process, because he would have to stop when people pulled in and out of the rest area. Hill drove to the next crossroad and pulled over to throw out the large jewelry box. He arrived in Cisco between 4:00 and 4:30 a.m. This was corroborated by his grandfather, John Conger, who testified that Hill returned at 4:30 a.m. on Saturday, May 20, 1978. Conger stated that he did not notice any blood on Hill or his clothing.

Upon arriving at his grandfather's house, Hill took the blanket, towels, and the victim's clothing out of the Mustang and placed them in the trunk of his Buick LaSabre. Hill noticed the blood in the back seat and tried to clean it up. When his grandfather asked about the guns and the blood in the back seat, Hill lied, stating that he had bought the guns from someone at work and that the blood came from a co-worker who had been injured. Hill spent the rest of the weekend in Cisco, helped his step-uncle work on a car, and went back to work on Monday morning. However, Hill only worked half a day on Monday, May 22, because of back pains he had suffered since working on his step-uncle's car. On Tuesday Hill went to the emergency room at the Eastland County Hospital and stayed in the hospital until Friday afternoon.

On Saturday, May 27, Hill left Cisco in his Buick LaSabre with all the items taken from appellant's residence, as well as the blanket, the bloody towels, and the victim's clothing. Hill did not realize that he had left a bloody towel in his grandfather's Mustang. Hill drove to Abilene from Cisco, where he checked into the Silver Spur Motel under the name J.D. Hawk. When Hill saw the manager's wife burning some

trash, he offered to watch the fire for her and then burned the clothes, the bloody towels and the blanket.

That same evening Hill used a Mobil credit card belonging to appellant's father in Clyde. Hill signed the receipt "W.G. Reed." Hill noted that appellant "told me I could use them [the credit cards] that there would be no problem." The North Dakota license plate number from Hill's Buick was also recorded on the receipt. On Monday, May 29, Hill spoke with Dick David, president and owner of the Texas Truck and Frame Company, about coming back to work, but David refused Hill's request. Consequently, Hill drove to Colorado Springs, Colorado, to see a chiropractor, using appellant's Master Charge card to finance the trip. Hill also used the Master Charge card in Colorado Springs on May 31 to purchase a bus ticket back to Abilene, but the ticket was never used. Burl Marshall, owner of the Coachlight Motel in Woodland Park, Colorado, testified that Hill, who had registered as Terry D. Reed, checked into his motel on May 31 and left before 5:00 a.m. the next morning. Hill explained that he "almost muffed it" in Manitou Springs, Colorado, because he started to sign his real name to the credit card receipt. "There's an 'H' before Terry D. Reed and it's scribbled out." [4] Hill returned to Abilene "late Saturday night or early Sunday morning" and went back to work for Dick David on the following Monday morning.

Hill noted that appellant was "very displeased" about his return, since appellant had expected Hill "to leave and stay gone." Hill continued to work until early September, when he left Abilene accompanied by a woman named Debbie Klements. Hill had met Klements at a bar and Klements testified that she wanted to get away from her husband. Hill, Klements, and her three children left for Colorado on September 6, 1978. They returned to Abilene on September 18. On September 21 Hill again left Abilene to work for Klements' uncle, Rex Blessing, at a truck repair shop in Roswell,

---

**4.** The Master Charge sales slip with the scratched out "H" is dated May 31, 1978, and was signed at Marshall's Motel in Woodland Park, not in Manitou Springs.

New Mexico. Hill testified that he left appellant's CB equipment and the guns with Klements. She verified that her husband later smashed the CB base station.

Hill returned to Abilene "just after Thanksgiving" to pick up the "stolen" guns, the sword, and some clothes from Klements' parents.[5] On the Saturday after Thanksgiving Hill was en route to Roswell when he was stopped by police in Andrews, Texas, because the taillights on his Buick were out. The police searched the trunk and found the weapons taken from appellant's residence.

Hill explained that Lieutenant Dieken came to Andrews to speak to him. Hill initially lied, stating that he had bought the weapons "from a guy in a bar," but later confessed that they were taken from appellant's home. Dieken testified that he learned about Hill's arrest on November 26, 1978. Dieken corroborated the fact that Hill had lied several times about how he had obtained the weapons, before telling the truth. Hill was brought back to Abilene on December 13, 1978, and on December 15 he signed a detailed written statement.

The non-accomplice evidence shows that on the evening of May 19, 1978, appellant, his wife, and their six-week-old daughter, Tabitha, went to the Western Sizzler in Abilene for dinner before attending a drive-in movie. Appellant told Lieutenant Dieken, who investigated the murder, that he left the drive-in shortly before midnight, drove around for approximately fifteen minutes, and then returned home around 12:15 a.m. This was corroborated by Gilbert Lara, a co-worker of appellant's, who testified that he saw appellant and his wife driving home around 12:00 p.m.

When the couple entered their house appellant placed the baby on the living room couch and turned on a lamp. Appellant told Dieken that he heard a "thud" and that his wife started "screaming loudly." As a result, appellant ran into the baby's

room and saw a man "on top of Marsha, beating her."

Appellant's brother-in-law, Johnny Thompson, related appellant's version of the incident as follows:

"A. Okay. He said he run into the baby's room and at that point he said he seen somebody on top of Marsha, and that he jumped on top of them trying to pull them off, and that while he was doing this that somebody started beating him on the back and that when he rolled over slightly that somebody hit him in the temple, right temple, and he said that was the last he remembers to the point until he got to, you know, my house.

"Q. He said then that he was knocked unconscious?

"A. Yes, sir."

Lieutenant Dieken also testified that appellant had remembered hitting the assailant with "both fists" and being hit across his "right shoulder." "And then [appellant's] next statement was 'It didn't hurt me all that much, but I seemed to roll over and that's all I remember until I woke up.'" After waking up in the baby's room appellant saw some blood "and something else" on the floor and proceeded to look for his wife. When he couldn't find her he ran to his brother-in-law's house.

Appellant arrived at Thompson's residence around 1:30 a.m. on May 20, 1978. Thompson recalled that appellant seemed to be "dizzy" and "spaced out," and that he "stumbled in through the front door and just kind of fell there in my living room." When appellant said that his wife was gone, Thompson got dressed and ran to appellant's house located a little over a block away. Upon arriving there Thompson noticed that several drawers had been pulled out and dumped on the floor, and that there was a lot of blood in the baby's room. Thompson also noticed a blue shirt lying on the floor; appellant had arrived at

---

5. Bob Blessing, Klements' brother, testified that he picked up the guns and the sword in late September, because he was "worried about [Klements'] welfare and the childrens' welfare with

those weapons in the house." Blessing took the weapons, along with some of Hill's clothes, to his parents' residence.

Thompson's house wearing only Wrangler blue jeans and boots, but no shirt. Thompson also recalled that it was raining slightly when he first ran to appellant's home, but that it rained harder later that same night.

Thompson recalled feeling a knot on the back of appellant's head,[6] as well as "the large lump that was on the front part of his head on his right temple." Thompson later noticed "some red marks on the right side of his back," as if appellant had been hit with an instrument. He said the marks were six or eight inches long. However, Thompson's statement to the police read: "I looked very close at Terry's back and I did not see any marks that would indicate that he had been hit very hard." On cross-examination Thompson testified that appellant recalled the blows on the back coming before the blow to the forehead.

Lieutenant Dieken testified that police records showed a call was made to the police department at 1:38 a.m. This corroborated Thompson's testimony that he called the police around 1:40 a.m. Thompson again called the police shortly before 2:00 a.m., and they finally arrived "a little bit after 2:00 o'clock."

Ruben Adams was the first police officer at the scene and the first person to interview appellant. Appellant told Adams that he had jumped on the intruder, grabbed him around the neck with the right hand, and then hit the intruder with his left hand. Appellant gave the same version to Officer John Perry. However, both Adams and Perry noticed swelling on appellant's *right* hand, and noticed no swelling to his left hand. Appellant also indicated that he had been hit across the shoulder, but Adams could see no injuries or any marks on his shoulders. Appellant did not complain about an injury to the back of his head, and Adams did not remember hearing about such an injury. On cross-examination Adams reiterated that there was no visible knot on the back of appellant's head.

Appellant also told Adams that the blue shirt he had been wearing was taken off *after* he had been knocked unconscious. Adams admitted picking up the shirt and noticing that it was torn, before dropping the shirt in the same location where it was found. This was corroborated by Officer Perry who stated that when Adams picked up the shirt Perry advised him to put it back until it could be photographed. Both Johnny and Lonnie Thompson testified that they saw Adams pick up appellant's blue shirt, but they did not notice whether the shirt was dropped into any bloody spots on the carpet. Johnny Thompson testified: "Basically, [Adams] just dropped it back down where he picked it up, yes, sir."

When Adams asked how the intruders might have gotten in, appellant mentioned a cut in the screen door at the back of the house. Adams investigated the screen door, but did not put his fingers through the slit. Later, Officer James Becker photographed the screen door and testified that "it didn't appear that anybody's hand had been stuck through it." Officer Perry also formed the opinion that no one had put a hand through the screen, because it "was not bulged out at the cut." Finally, Lieutenant Dieken was recalled to testify that *he* actually placed his hand through the slit in the screen. "To determine by myself whether somebody could have reached through that screen and unlock[ed] the door from inside I inserted my hand through the opening and unlatched the door from inside and when I removed my hand the screen was offset, or there was a bulge in there." It was Dieken's opinion that his was the first hand to go through the opening. There was no sign of entry through any window or door in the house.

Before leaving, Officer Adams investigated the back yard and noticed that appellant's dogs were not in the back yard, and that the back gate was open. Erin Snelson, appellant's next-door-neighbor, had

---

6. Thompson's brother, Lonnie, also testified feeling a knot on the back of appellant's "neck," although on cross-examination he stated "I felt something on the back of his head." Johnny Thompson's wife, Rebecca, said she felt a knot on the back of appellant's head, as did Jean Irvin, the deceased's mother, who described feeling "a huge knot on the back of [appellant's] head."

also noticed that the dogs were outside appellant's fenced back yard that night and that appellant's living room light was on, which she found to be "unusual." She estimated the time was 12:30 a.m. Snelson recalled that the Reeds' vehicle was not in the driveway at 11:30 p.m. when the Snelsons returned home that evening, nor had the living room light been on. Her mother, Betty Kinikin, arrived at the Snelson residence around 12:30 a.m. to pick up her son. Kinikin noticed that appellant's dogs were loose and she even petted them. Kinikin also noticed that the living room light was on at appellant's residence. Snelson further testified that while she was standing in the driveway talking to her mother she heard "a noise" coming from appellant's residence. She stated: "It sounded like something hitting the wall, or door being slammed, but their air conditioner was on, too." Betty Kinikin recalled that her daughter "kept looking over her shoulder," because she "kept hearing this funny racket."

Before being taken to the hospital, appellant gave Officer Perry an extensive list of personal property items missing from the residence when he regained consciousness. According to Perry, appellant "named three guns, two rifles, a .22 Ruger pistol, a jewelry box I believe he said was out of his bedroom. His billfold and his wife's purse." Also missing was a CB base station, another CB radio, an antique Civil War sword, and a smaller jewelry box. Perry also discovered numerous items of valuable personal property that had not been taken, including two portable television sets, a stereo, and money on the dresser in the bedroom. Officer Havin Yarborough, in charge of the pawn shop detail, testified that none of the items reported stolen ever turned up in any of the pawn shops in the Abilene area. By the time Lieutenant Dieken arrived at the scene, around 3:30 a.m., appellant had already gone to the hospital.

7. All four police officers who testified noted that appellant did not appear to have been unconscious. Officer Adams remarked that appellant seemed "very clear and awake," pointing out specific items of property that were missing.

Dr. Herbert Nassour, Jr., an emergency room physician in Abilene, examined appellant shortly after 3:45 a.m. on May 20. Dr. Nassour asked appellant several questions and noticed that he was very slow in answering. When appellant told him that he had been hit in the forehead, the doctor examined his head and could not locate any bumps, although he noticed some redness on the forehead. Dr. Nassour testified that the spot on appellant's forehead "looked like somebody had rubbed it real hard," and he could not detect any swelling. The appellant did not look like he had been hit in the forehead.

Appellant complained that his right hand hurt, and that he had struck the alleged assailant with his right hand. The doctor noticed some swelling on appellant's right hand and bruises, but there was nothing noticeable about his left hand. The doctor found no lumps or bumps on the back of appellant's head, and there was no indication that he had been struck on the back of the head.

"Q. Did he [appellant] tell you that he had or had not been struck on the back of the head?

"A. *He told me he had not. I asked specifically.*

"Q. All right. You asked specifically, and he said he had not?

"A. Yes, sir.

"Q. All right. And you found no indication that he had?

"A. That's right." (Emphasis supplied.)

Dr. Nassour also found no indication of a "karate chop" to appellant's back or neck as alleged by appellant's father, W.G. Reed.

It was Dr. Nassour's opinion that appellant appeared to be "shell shocked," and that he had suffered some emotional stress. However, there was no indication that appellant had recently been unconscious.[7] X-rays taken of appellant's skull,

Officer Becker observed that appellant "didn't seem disoriented and dazed," and responded normally to questions. Officer Perry also doubted that appellant had been unconscious, which prompted him to send appellant to the

his right hand, and his right ribs did not reveal any broken bones. Although Dr. Nassour determined that appellant was physically fit, he also felt that appellant had been through a traumatic experience. The doctor could not be sure whether appellant had "fooled" him about his condition, but conceded that this might be possible.

On cross-examination Dr. Nassour stated there would have to be some sign of injury, such as a bruise, to indicate that appellant had been knocked unconscious for half an hour. On redirect the doctor noted that it would have taken a very severe blow to the forehead to cause unconsciousness for half an hour, and that "a very large swelling" would result. Such swelling would have still been noticeable even after two or three hours.

Lieutenant Dieken took appellant to the police station from the hospital to be interviewed, noting that appellant seemed calm and collected. Around 6:00 a.m. Dieken learned that Marsha Reed's body had been found and without stating his intention, Dieken asked appellant to accompany him. Dieken described the following:

"We drove up to within, oh, thirty-five or forty yards of the body and I stopped my car practically in the middle of the road and probably over to the east side closer to the east shoulder. At that time I said, 'Terry, come on.' He looked at me and said, 'Do I have to?' And I said, 'Yes, you do, you've got to identify the body.' So, we walked together up to where the body was. He began sniffling and shaking and crying a little bit. And I said, 'Is that Marsha?' And he kind of just glanced down and said, 'Yes.' And then his next reaction from that was 'Can I go over here and sit in this other patrol car?' So, I told him yes he could. I asked him after I had already received information from him that that was Marsha then his next reaction was he just wanted to get away from there and he wanted to get over in the patrol car."

Dieken stated that appellant only got within six or seven feet of the body, and that the victim's face was turned *away* from the direction from which appellant was looking. It was Dieken's opinion that appellant could not have seen the victim's face, because "her clothing was up around her shoulders and neck and her hair was down over her head and face and you couldn't see her face at all." Upon returning to the police station Dieken took a detailed statement from appellant about the events of the previous night.

Dr. James Duff, a pathologist, performed the autopsy on Marsha Reed on May 20, 1978. He observed "bluish grey coloration especially around the eyes," indicating lack of oxygen to the head. The victim's face was also swollen with bruising around the orbit of the left eye. A wash cloth had been stuffed into the victim's mouth. The victim had also hemorrhaged from a cut above the left eyelid, and swelling in that area indicated she received more trauma to the left side of her face. Dr. Duff considered the wounds to have been caused by a right-handed person.

The wash cloth appeared to have been forced into the victim's mouth, and vomitous foodstuff and meat found beneath the tongue indicated that the victim had possibly vomited before the wash cloth was placed there. The effect of forcing the wash cloth into the victim's mouth was to press the tongue "back and up," thus cutting off the airway. Vomitous material was also found coming out of the nostrils, in the airways, and in the lung, causing the victim to aspirate.

Further examination revealed a laceration about 1¾ inches long on the back of the victim's head. This wound was caused by a sharp object, and was not severe enough to cause death. Dr. Duff testified that this cut was administered before death, due to the hemorrhage around it and the contusion. The victim suffered another laceration along her hairline to the right of

hospital to be examined. Finally, Lieutenant Dieken, who visited appellant at the hospital around 4:00 a.m., noted that after waking him

up appellant did not appear to act like other people Dieken had seen in the past who had been unconscious.

her nose. This wound was about an inch long and appeared to be superficial.

The victim also had a symmetrical scrape wound "in the shape of a half moon" on her lower back. This wound was consistent with the body being dragged.

An internal investigation into the victim's neck area showed considerable hemorrhage in the strap muscles around the trachea. The "hyoid bone," which lies above the thyroid cartilage and on top of the larynx, was fractured on the left side and had hemorrhage around it. This wound was also consistent with being caused by a right-handed person. Dr. Duff theorized that the most common cause of a fractured hyoid bone is manual strangulation. The injuries Dr. Duff observed on the victim were similar to others he had seen in manual strangulation cases.

Dr. Duff also testified that he did not find any marks on the victim's neck, although he could not rule out the possibility that a belt had been stretched around her neck. The doctor stated that if the victim were dead at the time a belt was wrapped around her neck, there would be a "greater possibility" that no marks would be visible.[8]

A pap smear of the victim's vagina revealed numerous sperm. Significantly, many of the spermatozoa still had tails, meaning that they had not started to degenerate. Dr. Duff was fairly certain that intercourse had taken place within 24 hours. There was no evidence of trauma to the vaginal area.

It was Dr. Duff's opinion that the cause of death was "asphyxia, secondary to strangulation, or just the cut off of oxygen and strangled to death." The doctor also felt that *both* factors had contributed to the victim's death.

After learning the results of Marsha Reed's autopsy, Dieken obtained samples of appellant's blood, saliva, pubic hairs, and head hairs. According to Officer Perry, the samples were obtained on Tuesday, May 23. Appellant told Dieken that he had not had sexual relations with his wife since Wednesday, May 17.

Sarah Williams, a forensic serologist, examined various pieces of evidence to detect and identify blood and body fluids. On carpet removed from the baby's bedroom she discovered several type A blood stains. Williams also found "vomitous material" on the same carpet. Type A blood was present on blankets found in the baby's bedroom, as well as on playpen mats. Furthermore, type A blood was found splattered on appellant's blue shirt, specifically on the front, the right sleeve, "and on the portion that was torn off with the buttons on it." The victim's blood was type A, while appellant's blood is type O.

The blood splattered on appellant's shirt was also consistent with Hill's blood type. Williams also tested the back seat of the 1967 Mustang for the presence of blood and body fluids. She found traces of blood along the seams and along the back edges. However, there was not enough blood present to even determine whether it was human or animal. A towel found in the Mustang contained human type A blood stains, consistent with the victim's blood type.

Williams analyzed vaginal swabs from the body of the deceased to determine whether seminal fluid was present. A positive reaction to the presence of acid phosphatase indicated the presence of seminal fluid. Due to the strength of the acid phosphatase reaction, plus the fact that the spermatozoa had not rapidly decomposed, Williams estimated that intercourse had taken place two to six hours prior to the

---

8. Dr. Jarrett Williams, a pathologist, testified for the defense. He noted: "[I]f there are no protective clothing (sic) there should be a mark or blemish of some type with a pull that is strong enough to close the windpipe or the larynx and also to produce a fracture of the hyoid bone of the neck. There should be a mark, or a blemish, or a depression of some type." On cross-examination Dr. Williams admitted that he had not examined Marsha Reed's body and that he was testifying "[i]n general terms from my own experience." He also stated that a fracture of the hyoid bone would be "more likely" to occur as a result of manual strangulation or by blows to the throat and neck area.

victim's death.[9] An examination of the body fluids from appellant and the victim, showed there was nothing inconsistent with appellant having had intercourse with his wife prior to her death.

An examination conducted on Howard Hill's body fluids revealed that he had type A blood, and was a secreter of blood group substance "A" and "O." His body fluid make-up was identical to that of the victim, and Sarah Williams testified that the male and female fluids could not be separated or distinguished. The tests were consistent with Hill, or the appellant, or both having had intercourse with the victim prior to her death. On redirect Hill denied having sexual relations with Marsha Reed, and to his "knowledge" neither did appellant.

Dieken's continuing investigation revealed that a Mobil credit card issued to appellant's father was used on May 27, 1978, at a Mobil station in Clyde, Texas. A North Dakota license number was written on the credit card receipt. From appellant's father Dieken learned that the credit card had been in appellant's billfold at the time of the murder, and due to an oversight it had not been reported stolen. This discovery lead to inquiries of every credit card company appellant and his wife were affiliated with, and requests for credit card statements issued after May 20. Appellant's Master Charge card was shown to have been used on several occasions at various gas stations, restaurants, and motels in Dalhart, Amarillo, Clayton, New Mexico, Monte Vista and Woodland Park, Colorado, as well as the Continental Bus Station in Colorado Springs, Colorado. The dates on the receipts showed that the card was used from May 31 through June 3, 1978.

Appellant was arrested on June 9, 1978.

In order to show appellant's motive for the murder of his wife, the State presented several witnesses who testified about appellant's relationship with a co-worker named Denise McKelvey. McKelvey testified that she and the appellant were "good friends," but stated that the relationship did not become "more than just friendly." McKelvey related that she received a phone call from Marsha Reed in March 1978. Marsha asked McKelvey not to ask appellant to drive her to work and told her not to speak to appellant at work. McKelvey admitted once putting a bandaid on appellant's forehead, but she was not aware that the incident had caused trouble between appellant and the deceased. McKelvey also testified that she had gone on a hunting trip with appellant and Rex Haas in September 1977. This was corroborated by Haas, who testified appellant and McKelvey held hands and kissed during the trip.

McKelvey stated that she had gone to see a movie with appellant on one occasion since the death of the deceased, and that she met him at the West Texas Fair in September 1978. These separate incidents were verified by Phil Mitchell, who saw appellant and McKelvey together at a cinema on Christmas Day 1978, and Vickie Jones, another Texas Truck and Frame employee, who saw the couple together at the fair holding hands.

When asked whether she and appellant had ever been "intimate," McKelvey replied: "One time." She explained that appellant had called her after his wife had delivered her baby, and that McKelvey congratulated him and offered to buy him a drink. The appellant picked McKelvey up at her apartment around 9:00 p.m. that same evening, and after "riding around a little while" they returned to appellant's house around 10:00 p.m. Appellant's wife was still in the hospital. McKelvey testified that she and appellant went to bed that evening, and that appellant "just kind of off the wall said, 'We should get married,' but he wasn't serious when he said it." McKelvey admitted to previous "heavy petting" having taken place at her apartment, but that this had not lead to sex. According to McKelvey, appellant never indicated that he wanted a divorce or separation from his wife.

9. On cross-examination she admitted that due to the high level of acid phosphatase intercourse could have taken place after the victim's death.

Jackie Hobbs, a former Texas Truck and Frame employee, was of the opinion that appellant and McKelvey were having an affair. He recalled a conversation in which appellant indicated that "as soon as his wife had her baby he planned to get rid of her." Hobbs stated: "I made some off-hand remark like he can't just knock her in the head and Terry said he thought if he could get away with it he would." At the time Hobbs did not take appellant's statement too seriously, but he later changed his mind after reading about Marsha Reed's death.

Several witnesses testified about appellant's interaction with McKelvey at work. Vickie Jones stated that she saw appellant and McKelvey kiss on three or four occasions in the front office. Jones also recalled a Friday night in March 1978, when McKelvey and her roommate Beverly came to Jones' apartment around midnight. Jones stated that McKelvey "appeared to be drunk" and wanted Jones to call the appellant for her. When Jones refused, McKelvey made the call but hung up when Marsha Reed answered the phone. Jones was under the impression McKelvey was in love with appellant.

Linda Bates testified that appellant and his wife "were having a lot of trouble" before Marsha's death, and that Marsha suspected that appellant was seeing someone else. Bates, whose husband Larry worked at Texas Truck and Frame, had previously seen McKelvey and appellant sitting together in appellant's pickup truck. Bates later told Marsha about this incident, and that she (Bates) "had heard talk." According to Bates, Marsha was "very much afraid" that appellant and McKelvey were having an affair.

Roy Havner, appellant's friend and co-worker, also testified that he had seen appellant and McKelvey kissing in the parking lot. According to Havner, "Terry [would] always go to work early and sit in the car and wait for her at lunch and after work some time an hour or two." Havner stated that appellant would make phone calls to McKelvey from his house, lasting 30 minutes or longer. Havner also recalled a fight appellant and his wife got into at a drive-in theatre, because Havner mentioned that McKelvey had placed a bandaid on appellant's forehead. On a separate occasion Havner and his wife Jodie were visiting the Reeds to watch a movie when appellant and his wife got into another fight about whether McKelvey brought appellant presents at work. The Havners left due to ·the tension. Roy Havner was not under the impression that the Reeds were happy together, although he had never heard appellant talk about wanting a separation or divorce.

Finally, Sherill Kincaid testified that she received a phone call in July 1978 from an unidentified woman who called "for a man she worked with and wanted some information on the house," which was for rent. The woman told Kincaid that the man was 22 years old, had an infant daughter, and a roommate. That same afternoon appellant came by to look at the house. The house was located directly across from the Elmwood Manor Apartments where McKelvey lived.

Ray Manley, a former Texas Truck and Frame employee, approached appellant about renting a house together in July 1978, and recalled visiting Kincaid's house on Potomac Street. Upon arriving at the house, Manley and appellant were greeted by Kincaid's husband Raymond, who informed them that the house had already been rented. Manley was aware of the close proximity of the Elmwood Manor Apartments, since he had previously dated McKelvey's roommate Beverly. Manley recalled only one occasion when he, Beverly, appellant, and McKelvey went out together since Marsha Reed's death.

Appellant did not testify at either stage of the bifurcated trial, and the trial judge instructed the jury that Hill was an accomplice witness as a matter of law.

Turning now to appellant's contention, we observe that Article 38.14, V.A.C.C.P., provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence *tending to connect the defendant with the offense*

committed;" and the corroboration is not sufficient if it merely shows the commission of the offense." (Emphasis supplied.)

■ In *Edwards v. State*, 427 S.W.2d 629 (Tex.Cr.App.1968), this Court wrote:

"The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the evidence of other witnesses with the view to ascertain *if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense.* If there is such evidence, the corroboration is sufficient; otherwise, it

is not. *Dalrymple v. State*, Tex.Cr.App., 366 S.W.2d 576; *Bradford v. State*, 170 Tex.Cr.R. 530, 342 S.W.2d 319."

See *Satterwhite v. State*, 726 S.W.2d 81, 88 (Tex.Cr.App.1986); *Losada v. State*, 721 S.W.2d 305, 308 (Tex.Cr.App.1986); *Killough v. State*, 718 S.W.2d 708, 710 (Tex. Cr.App.1986); *Romero v. State*, 716 S.W.2d 519, 523 (Tex.Cr.App.1986); *Cruz v. State*, 690 S.W.2d 246, 250 (Tex.Cr.App.1985); *Brooks v. State*, 686 S.W.2d 952, 958 (Tex. Cr.App.1985); *Carrillo v. State*, 591 S.W. 2d 876 (Tex.Cr.App.1979); *Brown v. State*, 561 S.W.2d 484, 487 (Tex.Cr.App.1978); *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr. App.1977).[10]

**10.** In briefing the sole contention here advanced both parties have used the test that the corroborating evidence need only make the accomplice witness' testimony "more likely than not." This is not the proper test. The proper test is set forth in Article 38.14, supra. It is the only test. *Cubit v. State*, 122 Tex.Cr.R. 286, 54 S.W.2d 535 (1932). This Court sought to make this clear in *Vertz v. State*, 702 S.W.2d 196 (Tex.Cr.App. 1986). The *Vertz* opinion refused the petition for discretionary review and affirmed the judgment of the Court of Appeals [*Vertz v. State*, 686 S.W.2d 696 (Tex.App.-Corpus Christi 1985) ], but disclaimed the "more likely than not" test utilized by the Court of Appeals. Citing *Cruz v. State*, 690 S.W.2d 246, 250 (Tex.Cr.App.1985), it was observed that the correct standard is the statutory "evidence tending to connect the defendant with the offense committed" test.

The confusion apparently stems from the language used in *Warren v. State*, 514 S.W.2d 458, 463 (Tex.Cr.App.1974): "Although appellant asserts otherwise, the corroboration need only tend to connect the accused with the offense charged. Article 38.14, V.A.C.C.P.; *Sheffield v. State*, 371 S.W.2d 49 (Tex.Cr.App.1963), *and make the accomplice's testimony more likely than not.*" (Emphasis supplied.) No authority was cited for this latter underlined statement. *Warren*, however, did not abandon the statutory test. To the contrary, *Warren* appears to add a requirement to the correct test, although when the evidence "tends to connect" the accomplice witness' testimony will normally then be "more likely than not," particularly where the accomplice witness in his testimony has made out a complete case against the defendant. The difficulty arose when later cases, often citing *Warren*, indicated the standard was only the "more likely than not" test. See, i.e., *Bentley v. State*, 520 S.W.2d 390, 393 (Tex.Cr.App.1975), and *James v. State*, 538 S.W.2d 414, 416 (Tex.Cr.App. 1976). Thus, to the extent they conflict with today's decision and the correct statutory "tending to connect" test, the following cases and all

others so holding are overruled: *Warren*, supra; *Bentley*, supra; *James*, supra; *Carrillo v. State*, 591 S.W.2d 876, 883 (Tex.Cr.App.1979); *McManus v. State*, 591 S.W.2d 505, 514 (Tex.Cr. App.1979); *Sheets v. State*, 606 S.W.2d 864, 866 (Tex.Cr.App.1980); *Passmore v. State*, 617 S.W. 2d 682, 684 (Tex.Cr.App.1981); *Eckert v. State*, 623 S.W.2d 359, 361 (Tex.Cr.App.1981); *Meyers v. State*, 626 S.W.2d 778 (Tex.Cr.App.1982).

Further, some Court of Appeals' opinions, citing some of the above cases, have utilized the wrong "more likely than not" test. To the extent they are in conflict with the instant case and the proper test, they are not to be followed or cited. See, i.e., *Chambers v. State*, 630 S.W. 2d 413, 416 (Tex.App.-Houston [14th] 1982); *Gordon v. State*, 640 S.W.2d 743, 757 (Tex.App.-San Antonio 1982); *Byers v. State*, 641 S.W.2d 629 (Tex.App.-Tyler 1982); *Hill v. State*, 644 S.W.2d 849, 854 (Tex.App.-Amarillo 1982); *Verrett v. State*, 648 S.W.2d 712 (Tex.App.-Beaumont 1982); *Edwards v. State*, 649 S.W.2d 710 (Tex.App.-Tyler 1983); *MacDonald v. State*, 650 S.W.2d 95, 96 (Tex.App.-Houston [14th] 1982); *Simmons v. State*, 650 S.W.2d 108, 109 (Tex. App.-Houston [14th] 1983); *Hill v. State*, 666 S.W.2d 130, 134 (Tex.App.-Houston [14th] 1983); *Wolf v. State*, 674 S.W.2d 831 (Tex.App. -Corpus Christi 1984); *Davis v. State*, 675 S.W. 2d 331, 332 (Tex.App.-San Antonio 1984); *Protz v. State*, 681 S.W.2d 296, 298 (Tex.App.-Houston [14th] 1984); *Parker v. State*, 693 S.W.2d 640, 644 (Tex.App.-Beaumont 1985); *Valdez v. State*, 700 S.W.2d 338, 341 (Tex.App.-Corpus Christi 1985); *Worthington v. State*, 714 S.W.2d 461, 463 (Tex.App.-Houston [1st] 1986).

The danger of the "more likely than not" test lies in the fact that an accomplice witness may state any number of facts that may be corroborated by evidence of other witnesses making his testimony "more likely than not" yet none of the facts may tend to connect the defendant with the commission of the alleged offense. See *Castaneda v. State*, 682 S.W.2d 535 (Tex.Cr.App. 1984); *Paulus v. State*, 633 S.W.2d 827, 844

■ In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances. *Mitchell v. State,* 650 S.W.2d 801, 807 (Tex.Cr.App.1983), cert. den. 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221; *Paulus v. State,* supra at 844.

■ All the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary. *Washburn v. State,* 318 S.W.2d 627, 634 (Tex.Cr.App. 1958); *Brown v. State,* 561 S.W.2d 484 (Tex.Cr.App.1978). The corroborative evidence may be circumstantial or direct. 23 C.J.S., Crim. Law, § 812(3), p. 107; *Brown v. State,* supra. The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test. *Perkins v. State,* 450 S.W.2d 855 (Tex.Cr.App.1970); *Colunga v. State,* 481 S.W.2d 866 (Tex.Cr.App.1972); *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr.App.1983), cert. den. 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221. It is not necessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Attwood v. State,* 509 S.W.2d 342 (Tex.Cr.App.1974); *Reynolds v. State,* 489 S.W.2d 866 (Tex.Cr.App.1972); *Mitchell v. State,* supra; *Shannon v. State,* 567 S.W.2d 510, 513 (Tex.Cr.App.1978); *Castaneda v. State,* 682 S.W.2d 535, 537 (Tex. Cr.App.1984); *Richardson v. State,* 700 S.W.2d 591, 594 (Tex.Cr.App.1985). Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of accomplice witness testimony. *Holmes v. State,* 70 Tex.Cr.R. 423, 157 S.W. 487 (1913); *Paulus v. State,* 633 S.W. 2d 827, 844 (Tex.Cr.App.1982); *Mitchell v. State,* supra.

In *Reynolds v. State,* supra, it was written:

"The corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish his guilt. Otherwise the testimony of the

(Tex.Cr.App.1982); *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr.App.1983), cert. den. 464 U.S. 1073,

accomplice would be valueless. The corroborative evidence is sufficient if it tends to connect the accused with the crime, and it is the cumulative weight of such evidence which supplies the test." See also *Minor v. State,* 108 Tex.Cr.R. 1, 299 S.W. 422 (1927).

In the instant case the accomplice witness Hill made out a complete case against the appellant. Without the requirements of Article 38.14, supra, there could be no question as to the sufficiency of the evidence to sustain the jury's verdict. Applying Article 38.14, supra, as we are required to do, and the test of sufficiency of the corroboration as discussed in *Edwards v. State,* supra, we must look to the non-accomplice witness' testimony.

■ Article 38.14, supra, expressly provides that evidence merely showing the commission of an offense is not sufficient alone to corroborate an accomplice witness. *Nelson v. State,* 542 S.W.2d 175 (Tex.Cr. App.1976); *Anders v. State,* 501 S.W.2d 665 (Tex.Cr.App.1973); *Reynolds v. State,* supra. However, it is a factor to be considered along with other possible factors in determining whether there is sufficient independent evidence to corroborate the accomplice witness. *Mitchell v. State,* supra, at 807; *Paulus v. State,* supra, at 845. The independent evidence in this case showed the murder of appellant's wife by someone.

■ The other non-accomplice testimony, inter alia, showed that the appellant was having an affair with Denise McKelvey, a co-worker, with whom he was seen kissing and holding hands. McKelvey testified they had been intimate at appellant's house while his wife was in the hospital after the birth of their baby. He had even mentioned marriage to her. The affair had caused marital discord, and the appellant and deceased had argued about his relationship with McKelvey in the presence of others, and the deceased had once told McKelvey not to talk to her husband at

104 S.Ct. 985, 79 L.Ed.2d 221.

work. Appellant told Hobbs, a co-worker, that he planned to get rid of his wife after the birth of their child. When told (by Hobbs) that he couldn't "just knock her in the head," appellant replied that if he "thought he could get away with it he would."

█ Evidence which *merely* goes to show motive or opportunity of the accused to commit the crime is insufficient alone to corroborate the accomplice witness. It may, however, be considered in connection with other evidence tending to connect the accused with the crime. *Paulus v. State,* supra, at 846; *Mitchell v. State,* supra, at 808; *Reynolds v. State,* supra; *Rogers v. State,* 461 S.W.2d 399 (Tex.Cr.App.1970); 23 C.J.S., Crim.Law, § 812(4), p. 111. Thus the "affair" may be considered in connection with all other evidence tending to connect the appellant with the murder of his wife. See and cf. *Duff–Smith v. State,* 685 S.W.2d 26 (Tex.Cr.App.1985).

In *Brown v. State,* 672 S.W.2d 487, 489 (Tex.Cr.App.1984), this Court wrote:

"Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Passmore v. State,* 617 S.W.2d 682 (Tex.Cr.App.1981); *Rodriquez v. State,* 508 S.W.2d 80 (Tex. Cr.App.1974); *Edwards v. State,* 427 S.W.2d 629 (Tex.Cr.App.1968)." See also *Shannon v. State,* 567 S.W.2d 510, 513 (Tex.Cr.App.1978); *Cawley v. State,* 166 Tex.Cr.R. 37, 310 S.W.2d 340, 342 (1957).

By his own statements to the police and others appellant acknowledged that he was present at the time of the offense in his home. He was not shown by non-accomplice testimony to be with Hill, his co-worker, and accomplice witness shortly before, at the time of or shortly after the offense, although non-accomplice testimony placed Hill in the neighborhood on the night in question. Nor does the evidence show flight. However, we look to see if other suspicious circumstances are present. Appellant claimed to police that he had been rendered unconscious for about 30 minutes, that when he regained consciousness he looked for his wife and then ran to his brother-in-law's house. The brother-in-law testified that appellant arrived at his house around 1:30 a.m. The time frame does not fit appellant's story since approximately an hour and 15 minutes would have elapsed between his fight at 12:15 a.m. with the intruder or intruders and his arrival at the brother-in-law's house. The evidence would indicate that appellant did more during that time than look for his wife and run down the street to his brother-in-law's house. There was time to do what Hill testified that appellant did.

Four police officers observing appellant after responding to a call about his wife's disappearance did not believe from their observations he had been unconscious. As a result appellant was taken to a hospital. The doctor who examined him and had him x-rayed, etc., was of the opinion that appellant had not been rendered unconscious as he contended by a blow to the forehead. Appellant stated to the doctor that only his forehead had been injured. The doctor saw only redness and no swelling on the right side of the forehead. He found no other injuries. Appellant had earlier stated to one officer he had been hit from the rear. This was not, however, what he told the doctor in answer to specific questions.

Hill, the accomplice witness, testified that appellant had pushed the body of the deceased out of the car "face first" onto the side of the highway, and bumped his forehead on the right side. Thus, according to Hill, appellant was well aware of the location of the body. When the body of the deceased was found, and the police notified, Lt. Dieken took appellant to the scene along the highway, without stating to appellant his intention. He related that appellant got within only six or seven feet of the body on the side of the highway, glanced down, and immediately identified the body as that of his wife, and went immediately to the police vehicle. The deceased's face was turned away from appellant's position and was not otherwise visible because of hair and the clothing being

pushed up. Dieken was of the opinion appellant could not have seen the face. Sgt. Ronald Harris observed the identification and stated that from appellant's position a person could not tell if the body was male or female, see the face, or tell who it was.

Hill testified that in preparing the scene to appear that a burglary had occurred after the killing of the deceased, appellant cut a 6" to 8" slit in the screen above the door and right above the latch and that neither he nor appellant put his hand through the cut or slit. Upon investigating possible points of entry, appellant himself alerted the police to the cut in the screen and told them the house was otherwise secure. The screen was cut vertically and was not bulged out as if a hand or instrument had entered the slit. It appeared undisturbed. No other points of entry were found.[11] When Lt. Dieken inserted his hand through the slit to determine if the door could be opened such action left a bulge in the screen which had not been there before.

Hill testified that appellant struck his wife in the face with his right hand. The pathologist testified the wounds to the left side of the deceased's face had been caused by a right-handed person. Appellant told some of the officers that he had hit the assailant with his left hand. It was, however, observed that only his right hand appeared bruised and swollen. He later told others, however, that he had hit the assailant with his right hand. This was typical of a number of inconsistencies appellant related to officers or others after the alleged offense.

There are other matters that could be discussed, but we do not deem it necessary. All the facts and circumstances in the case, both direct and circumstantial evidence, may be looked to in furnishing the necessary corroboration. Keeping in mind that testimony of the accomplice witness made out a complete case against the appellant, we conclude that the combined cumulative weight of the incriminating evidence furnished by the non-accomplice testimony tends to connect the appellant with the commission of the offense and supplies the proper test.[12]

The judgment of the conviction is affirmed.

---

11. The window in the baby's room was raised, but not enough to let a body enter, the dust and dirt on the sill were undisturbed, and although the ground was wet outside, no footprints were found outside the window, and no muddy footprints were found in the house.

12. Many of the things that Hill stated that he had done before and after the alleged offense were corroborated by the testimony of other witnesses. It must be remembered that although an accomplice witness may state any number of facts that are corroborated by evidence of other witnesses, still if the facts do not tend to connect the accused with the crime, corroboration on that basis would not meet the requirements of Article 38.14, supra. *Paulus v. State*, supra, at 844; *Mitchell v. State*, supra. In reaching our conclusion, we have kept in mind this proposition of law.