Patricia SEXTON, Appellant,

v.

STATE of Texas, Appellee.

No. 12–99–00173–CR.

Court of Appeals of Texas,
Tyler.

Nov. 15, 2000.

Rehearing Overruled Dec. 19, 2000.

Discretionary Review Refused
May 30, 2001.

James W. Volberding, Tyler, for Appellant.

James Cromwell, Cherokee County Dist. Atty., Rusk, for State.

Panel consisted of DAVIS, C.J., HADDEN, J., and WORTHEN, J.

WORTHEN, Justice.

A jury convicted Patricia Sexton ("Appellant") of murdering her husband, and it assessed her punishment at life imprisonment. On appeal, Appellant presents ten issues for our consideration. We affirm.

## BACKGROUND

Appellant and Bobby Sexton ("Sexton") were married. Appellant began having an affair with Michael Fielding ("Fielding") in November of 1997. In November or December of 1997, Sexton filed for divorce from Appellant. During the divorce proceedings, the court gave custody of their children to Sexton. In January of 1998, Appellant attempted to reconcile with Sexton. Fielding testified that Appellant told him the only reason she went back to Sexton was to get their kids. He further testified that on several occasions in early February of 1998, Appellant asked him if he had any cocaine. Fielding testified that Appellant wanted to use the cocaine to get Sexton arrested so she could obtain custody of their children. Then, on February 11, 1998, Appellant told Fielding that she wanted Sexton dead because she was tired of him beating on her and raping her. Fielding asked Appellant why she did not leave Sexton. She said that she could not because he would get custody of their kids. Later that day, Appellant asked Fielding and Willie Wright ("Wright") if they knew a hit man. Fielding said no, but Wright said that he would kill Sexton for $2,500.00. However, no agreement was reached at that point. The next day, Appellant asked Fielding to kill Sexton. He refused. Fielding testified that during the next few days, Appellant repeatedly asked him to kill Sexton. Finally, he agreed. Appellant told Fielding that she wanted it done on February 20. Thereafter, Appellant called Fielding several times to confirm that he would do it. Also, she brought Fielding surgical gloves to use when he killed Sexton. That night, Appellant and Sexton brought pizza to Fielding and Wright at a shop where Fielding worked as a mechanic. Again, Appellant asked Fielding if he was going to kill Sexton. Apparently, Appellant and Sexton re-

turned to Appellant's house after delivering the pizza. Around 10:30 p.m., Wright gave Fielding a shotgun and told him that he would go get Sexton. Fielding waited at the bottom of a hill outside the shop. After some time, Wright returned with Sexton. Fielding shot Sexton in the chest. After the shooting, Appellant called Fielding and asked whether it was over. Fielding said yes and asked her to bring Sexton's Suburban. Appellant told Fielding that she could not bring the Suburban because Sexton had the keys. Fielding found the keys in Sexton's right front pocket and gave them to Appellant when she arrived at the scene of the shooting. This set of keys consisted of eight or ten keys with a "little 'ole emerald' thing on it." Appellant left and returned to the scene driving Sexton's Suburban. Fielding testified that when Appellant returned with the Suburban, he observed only a single key in the ignition, not the set of keys he had taken off Sexton's body earlier that night. Fielding and Wright loaded Sexton's body into the back of the Suburban and dumped the body into the Neches river. Eventually, they abandoned the Suburban near Dialville, Texas. On March 25, 1998, Wright led Mike Daniel ("Daniel"), Chief Investigator of the Cherokee County Sheriff's Department, to Sexton's body.

Appellant was charged with capital murder by an indictment alleging that she intentionally or knowingly caused the death of Sexton "by, shooting him with a firearm, for remuneration or the promise of remuneration from Bobby Sexton, to wit: proceeds from payments, claims, awards, or benefits due or expected by Patricia Sexton upon the death of Bobby Sexton." Remuneration or the promise of remuneration was the aggravating factor causing the offense to rise to capital murder. TEX.PEN.CODE ANN. § 19.03(a)(3) (Vernon 1994). The jury acquitted Appellant of capital murder, but convicted her of the lesser included offense of murder under the law of parties.

## MOTION FOR NEW TRIAL

■■■ In issue one, Appellant contends that the trial court erred by failing to hold an evidentiary hearing on her motion for new trial. We disagree. A defendant does not have an absolute right to a hearing on a motion for new trial. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex.Crim.App. 1993). To obtain a hearing on a motion for new trial, a defendant must present the motion within ten days of filing, unless the trial court in its discretion permits it to be presented and heard within seventy-five days from the date when the court imposes sentence in open court. TEX.R.APP.P. 21.6; *Musgrove v. State*, 960 S.W.2d 74, 76 (Tex. Crim.App.1998); *Davis v. State*, 7 S.W.3d 695, 698 (Tex.App.—Houston [1st Dist.] 1999, no pet.). The term "present" means "the record must show the movant for a new trial sustained the burden of actually delivering the motion for new trial to the trial court or otherwise bringing the motion to the attention or actual notice of the trial court." *Carranza v. State*, 960 S.W.2d 76, 79 (Tex.Crim.App.1998). Examples of "presentment" include obtaining the trial court's ruling on the motion for new trial, the judge's signature or notation on a proposed order, or a hearing date on the docket. *Id.* Further, a trial court must rule on a motion for new trial within seventy-five days after the defendant was sentenced. TEX.R.APP.P. 21.8(a). If the court does not rule within this time, the motion is deemed overruled by operation of law at the expiration of the seventy-five-day period. TEX.R.APP.P. 21.8(c). Once the seventy-five days expires, a defendant may not complain of the trial court's failure to grant a new trial because the trial court has no authority to do so. *Baker v. State*,

956 S.W.2d 19, 25 (Tex.Crim.App.1997). Any action on a motion for new trial after this time is a nullity. *State ex rel. Cobb v. Godfrey*, 739 S.W.2d 47, 49 (Tex.Crim.App. 1987); *Meek v. State*, 628 S.W.2d 543, 547 (Tex.App.1982). It is the defendant's burden to ensure that the hearing is set on a date within the trial court's jurisdiction. *Baker*, 956 S.W.2d at 25; *Crowell v. State*, 949 S.W.2d 37, 38 (Tex.App.—San Antonio 1997, no pet.).

■■■ Here, Appellant's sentence was imposed on April 28, 1999. The seventy-fifth day was July 12, 1999. Her motion for new trial was timely filed on May 28, 1999. The motion does not contain a request for a hearing and there is no evidence in the record that Appellant presented the motion to the trial court within ten days of filing the motion. On July 13, 1999, the clerk file-marked Appellant's "supplemental" motion for new trial, which does contain a request for a hearing. However, merely filing a motion for new trial alone does not satisfy the presentment requirement. *Carranza*, 960 S.W.2d at 78. Further, the seventy-five-day period had already expired. Although more than seventy-five days had passed since sentence was imposed,[1] the trial court held a hearing on Appellant's motion on August 27, 1999. At the hearing, the trial court

announced that because seventy-five days had elapsed,[2] Appellant's motion had been overruled as a matter of law of law. Tex. R.App.P. 21.8. Therefore, the trial court determined that it did not have jurisdiction to conduct a hearing.

The record demonstrates that Appellant failed to ensure that her motion was presented and heard within the time prescribed by the Texas Rules of Appellate Procedure. Thus, the trial court correctly concluded that Appellant's motion had been overruled by operation of law and that it did not have jurisdiction to hear evidence on the motion. *Carranza*, 960 S.W.2d at 79 (trial court did not err in failing to conduct a hearing on a motion for new trial where Appellant failed to present the motion to the trial court); *Baker*, 956 S.W.2d at 25 (appellant failed to preserve error on complaint that trial court failed to conduct a timely hearing where he failed to object to the untimely setting). Accordingly, issue one is overruled.[3]

### CORROBORATION OF FIELDING'S TESTIMONY

■■■ In issues two and three, Appellant challenges the legal and factual sufficiency of the evidence to corroborate Fielding's testimony. The jury was in-

---

1. There is a notation on the docket sheet made on August 12, 1999, setting the hearing for August 27.

2. On the docket sheet and in an order denying Appellant's motion for new trial, the trial court noted that the motion was overruled as a matter of law because it had not been set for hearing within seventy-five days of the filing of the motion for new trial. This statement is incorrect in that it calculates the seventy-five-day period from the filing of the motion, not the date of sentencing. However, the trial court was correct in finding that the motion had been overruled by operation of law. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim.App.1990) (noting that a trial court's ruling will be sustained if it is correct on any

theory of law applicable to the case, and even if the trial court gives the wrong reason for its decision).

3. We note that the judgment stated that the offense occurred on February 20, 1999. On May 13, 1999, the trial court signed an order granting the State's motion nunc pro tunc and stating that the judgment should reflect the correct offense date of February 20, 1998. Appellant does not argue that the correction of the offense date extended the seventy-five-day period. In any event, if one considers May 13, 1999 as the date sentence was imposed, the hearing on August 27 still fell outside the seventy-five-day period.

structed that Fielding was an accomplice. A conviction cannot be had upon the testimony of an accomplice witness unless corroborated by other evidence tending to connect the accused to the offense. Tex. Code Crim.Proc.Ann. art. 38.14 (Vernon 1979). Contrary to Appellant's assertion, we do not review the legal and factual sufficiency of corroborative evidence. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex.Crim.App.1999). Rather, to determine whether an accomplice's testimony is sufficiently corroborated, we eliminate from consideration the testimony of the accomplice witness and examine the remaining evidence to ascertain whether there is evidence which tends to connect the accused to the offense. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex.Crim.App.1997); *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex.Crim.App.1988). The combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses may be sufficient if it tends to connect the accused to the offense. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim. App.1988). It is not necessary that the corroborative evidence directly link the accused to the offense or be sufficient in itself to establish guilt beyond a reasonable doubt. *Id.; see also Hernandez*, 939 S.W.2d at 176. No precise rule can be devised as to the amount of evidence that is required to corroborate the testimony of an accomplice witness. *Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim.App.1994). Each case must be analyzed on its own facts and circumstances. *Id.; Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App.1993). All facts and circumstances may be looked to as furnishing the necessary corroboration. *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex.Crim.App.1983). "The corroborative evidence may be circumstantial or direct." *Reed* 744 S.W.2d at 126.

■ On February 22, 1998, Appellant provided a voluntary statement to the Cherokee County Sheriff's Department. In this statement, Appellant told authorities that she had last seen Sexton around 11:15–11:20 p.m. on February 20 when he left "in the truck." Later, around midnight on February 24, 1998, Chris White ("White"), a deputy with the Cherokee County Sheriff's Department, testified that he was dispatched to Appellant's residence on a report of possible sexual misconduct. While he was there, Appellant described events on the evening of Sexton's disappearance. Appellant told White that she and Sexton were at her residence trying to reconcile their marriage. At some point, Sexton became concerned that he had left a light on in the shop and left the house to go to the shop on foot.[4] Appellant stated that after approximately two hours, she became very concerned about Sexton, went outside, and discovered that a Blazer was missing from the driveway. White testified that there was a Blazer in the driveway the night he was there. Appellant told White that she had initially assumed Sexton had gone to Jacksonville to either go to the store or visit family or friends. At this point, Appellant changed her story and told White that Sexton left in the Suburban, not the Blazer. White testified that there was a Suburban in the driveway the evening he was there. Appellant stated that her family had located the Suburban and brought it back to her residence. She also stated that as she and another family member were inspecting the vehicle, they discovered dried blood on the bumper.

Linda Gail Bingham ("Bingham"), Appellant's mother, testified that she and her boyfriend, Al Clark, Jr. ("Clark") moved in with Appellant after Sexton's body was

---

4. White stated that the shop is a couple of hundred yards east of Appellant's residence.

found. She testified that a couple of weeks after Sexton's body was found, she saw Sexton's keys in Appellant's bedroom. Bingham testified that the keys consisted of a key ring with maybe three keys and a wedding band on it. She also testified that these were the keys to the Suburban. She stated that she recognized the keys as being Sexton's because she had seen them before. Bingham further testified that between Sexton's disappearance and the discovery of his body, she heard Appellant's grandmother, Dorothy Bingham ("Dorothy"), ask Appellant "if everything was cleaned up, there was no way nobody could find anything." Bingham believed that Dorothy asked this question "to know if they could find anything that might get them in trouble...." She testified that Appellant responded, "Yes, it's all took care of." Further, Bingham testified that before Sexton's disappearance, Appellant told her, Clark and Fielding that the "only way she would ever be rid of him was for him to be dead." In addition, she testified that at the time Appellant's divorce was pending, Appellant was having an affair with Fielding. Bingham stated that Appellant was unhappy about losing custody of her children to Sexton. She also testified that Appellant and Appellant's grandmother asked Clark to set up a drug deal where Sexton would be killed. According to Bingham, the purpose of getting rid of Sexton was to enable Appellant to get her children back.

Clark testified that on February 21, 1998, he observed Sexton's Suburban on a high-line right-of-way in Dialville, but did not approach it. The next day, Clark returned to the Suburban and drove it to a wrecking yard. Clark observed a single key in the ignition. He further testified that he was familiar with a "roll or ring" of keys that Sexton used in his daily work. He stated that this set of keys was not in the Suburban when he drove it on Febru-

ary 22. Clark testified that after Sexton's disappearance, he was at the "river," saw this set of keys in Appellant's possession, and asked her about them. She told him that "he didn't need to know anything about them" and she threw them into the river. Further, Clark testified that he overheard Appellant and Fielding discussing how they were going to get away from Sexton. Clark also testified that Appellant and her grandmother asked him to get some drugs to set Sexton up. He testified that initially he told he told them he would do it, but then changed his mind and told them he did not want to be involved. Finally, Daniel testified that when he asked Wright about Sexton's disappearance, he told him to ask Appellant.

The non-accomplice evidence showed that after changing her story, Appellant told White that Sexton left her residence in the Suburban on February 20. When the Suburban was found, it had a single key in the ignition. However, Sexton's set of keys was in Appellant's possession. Eventually, Appellant threw this set keys into the river and told Clark that he did not need to know about them. The circumstances surrounding Sexton's keys could be seen as tending to connect Appellant to the offense.

■ Further, the non-accomplice evidence also showed that (1) Appellant was having an affair with Fielding, (2) Appellant was upset about losing custody of her children to Sexton, (3) she discussed using drugs to set Sexton up, (4) she stated, in Fielding's presence, that the only way to get rid of Sexton was for him to be dead, (5) Appellant and Fielding discussed getting away from Sexton, (6) Appellant and her grandmother apparently discussed the state of the crime scene, and (7) Wright directed authorities to Appellant when asked about Sexton's disappearance. Evi-

dence showing motive or opportunity can be considered with other evidence tending to connect the accused to the offense. *Reed,* 744 S.W.2d at 127; *Paulus v. State,* 633 S.W.2d 827, 846 (Tex.Crim.App.1981). Appellant's emotional state related to the loss of her children to Sexton could show a motive for murder, either as retribution or in an attempt to regain custody of the children.

▉ Appellant contends that much of the non-accomplice evidence adduced at trial should not be believed. Such an analysis is not appropriate under article 38.14 of the Texas Code of Criminal Procedure. *Cathey,* 992 S.W.2d at 462–63. "All the law requires is that there be some non-accomplice evidence which tends to connect the accused to the commission of the offense." *Hernandez,* 939 S.W.2d at 178. Although the non-accomplice evidence detailed herein may not alone establish Appellant's guilt, reasonable jurors could conclude that this evidence, viewed as a whole, tended to connect Appellant to the offense. *Id.; see also Cox v. State,* 830 S.W.2d 609, 612 (Tex.Crim.App.1992). Accordingly, we hold that such non-accomplice evidence sufficiently corroborated Fielding's testimony. Issues two and three are overruled.

### ACCOMPLICE WITNESS INSTRUCTIONS

▉ In issue four, Appellant complains that the trial court deprived her of a fair trial by failing to instruct the jury that Clark was an accomplice as a matter of law or fact and that his testimony must be corroborated by other evidence. In issues six and seven, Appellant argues that the State failed to present legally and factually sufficient evidence to corroborate Clark's testimony. The Texas Court of Criminal Appeals has recently explained (1) the meaning of the term "accomplice," (2)

when the trial court must instruct the jury that an inculpatory witness is an accomplice as a matter of law, and (3) when the trial court should inquire of the jury whether a witness is an accomplice as a matter of fact:

An accomplice participates before, during or after the commission of the crime . . .

We have . . . repeatedly stated that a person is an accomplice if he or she could be prosecuted for the same offense as the defendant, or a lesser included offense. By this we mean that a person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a blameworthy participant. 'The test is whether of not there is sufficient evidence in the record to support a charge against' the witness alleged to be an accomplice . . . Whether the person is actually charged and prosecuted for their participation is irrelevant to the determination of accomplice status—what matters is the evidence in the record.

Finally, when an accomplice witness testifies it is the jury's task to determine whether the testimony has been sufficiently corroborated. Some witnesses are accomplices as a matter of law. If "there exists no doubt or the evidence clearly shows that a witness is an accomplice witness as a matter of law, [then] 'the court is under a duty to instruct the jury.'" Others are accomplices as a matter of fact. If the evidence presented by the parties is conflicting, and it is not clear whether the witness is an accomplice, the jury must initially determine whether the witness is an accomplice as a matter of fact. If the evidence is conflicting, it is proper to leave the question of whether an inculpatory witness is an accomplice witness as a mat-

ter of fact to the jury under instructions defining the term accomplice.

*Blake v. State,* 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998) (citations omitted). If the evidence is clear that the witness is not an accomplice witness, no instruction need be given to the jury either that the witness is an accomplice as a matter of law, or in the form of a fact issue whether the witness is an accomplice witness. *Gamez v. State,* 737 S.W.2d 315, 322 (Tex. Crim.App.1987).

█ Bingham testified that she told a defense investigator that she thought Clark was involved in Sexton's murder. She also testified that Clark initially agreed to buy drugs, plant them on Sexton and set up a "dope deal" where Sexton would be killed. Appellant argues that Bingham's testimony demonstrated that Clark was an accomplice as a matter of law or, at least, fact. Appellant also points to the fact that Clark "conveniently found" Sexton's Suburban the day after the murder and drove it home.

While Bingham admitted that she initially implicated Clark in Sexton's murder, she testified that this statement was false and that her testimony at trial was truthful. She testified that she said that Clark was involved to protect Appellant and to "stay in the family." Thus, Bingham's pre-trial statement implicating Clark is highly suspect and insufficient to support "a charge against" Clark. *Blake,* 971 S.W.2d at 455. With regard to Clark's agreement to participate in a scheme to plant drugs on Sexton, Bingham testified that Clark did not "follow through" on this agreement. Clark testified that Appellant and her grandmother asked him to set Sexton up with some drugs to get him busted. He stated that he initially agreed, but later backed out. Clark's agreement to participate in a scheme to plant drugs on Sexton does not alone demonstrate that

he was connected with or participated in Sexton's murder. Moreover, the evidence showed that Clark decided not to participate in the plan to plant drugs on Sexton. *Singletary v. State,* 509 S.W.2d 572, 575 (Tex.Crim.App.1974) (holding that evidence failed to show individual was an accomplice where individual terminated his involvement in conspiracy to commit murder prior to actual murder). Concerning the discovery of the Suburban, Clark testified that he found the Suburban while working in the area. No other evidence links Clark to the offense charged.

Having reviewed the record, we conclude that there was insufficient evidence before the jury to establish Clark as an accomplice. Thus, we also conclude that the trial court was not required to instruct the jury that Clark was an accomplice as a matter of law or to submit a question inquiring whether Clark was an accomplice. Because Clark was not an accomplice, it was not necessary that Clark's testimony be corroborated under article 38.14 of the Texas Code of Criminal Procedure. Based on the foregoing, issues four, six and seven are overruled.

█ In issue five, Appellant contends that the trial court deprived her of a fair trial by failing to instruct the jury that Wright was an accomplice as a matter of law or fact and that his testimony must be corroborated by other evidence. In issues eight and nine, Appellant asserts that the State failed to provide legally and factually sufficient evidence to corroborate Wright's testimony. Wright did not testify at trial. As the State points out, an accomplice witness instruction is not required when statements of a non-testifying accomplice are introduced into evidence. *Bingham v. State,* 913 S.W.2d 208, 213 (Tex.Crim.App. 1995); *Hammond v.. State,* 942 S.W.2d 703, 707 (Tex.App.—Houston [14th Dist.] 1997, no pet.). Nor is it necessary that a

non-testifying accomplice's testimony be corroborated. *Id.; White v. State,* 982 S.W.2d 642, 649 (Tex.App.—Texarkana 1998, pet. ref'd). Even if it were necessary to corroborate Wright's testimony, the evidence discussed above would satisfy that requirement. Accordingly, issues five, eight and nine are overruled.

### *PHOTOGRAPHS OF VICTIM*

In issue ten, Appellant asserts that the trial court abused its discretion under Texas Rule of Evidence 403 by admitting gruesome photographs of Sexton's body. The trial court's decision to admit photographs is reviewed under the abuse of discretion standard. *Williams v. State,* 958 S.W.2d 186, 195 (Tex.Crim.App.1997). We reverse the trial court's decision to admit photographs only if the decision was outside the zone of reasonable disagreement. *Narvaiz v. State* 840 S.W.2d 415, 429 (Tex.Crim.App.1992). Under Rule 403, all relevant evidence is admissible unless "its probative is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury or by considerations of undue delay, or needless presentation of cumulative evidence." TEX.R.EVID. 403; *Long v. State,* 823 S.W.2d 259, 271 (Tex.Crim.App.1991). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Jones v. State,* 944 S.W.2d 642, 652 (Tex.Crim.App.1996). Further, "Rule 403 requires exclusion only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Id.* We may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to (1) the number of exhibits offered, (2) their gruesomeness, size, and detail, (3) whether they are in black and white or color, (4) whether they are close-up, (5) whether the body is naked or clothed, and (6) the availability of other means of proof and the circumstances unique to each case. *Williams,* 958 S.W.2d at 196; *Long,* 823 S.W.2d at 272. "A trial court does not err merely because it admits into evidence photographs which are gruesome." *Sonnier v. State,* 913 S.W.2d 511, 519 (Tex. Crim.App.1995). Photographs are generally admissible where verbal testimony about the same matters is admissible. *Jones,* 944 S.W.2d at 652.

At trial, Appellant objected to the admission of four photographs. State's Exhibit Eight shows Sexton's body in the river. State's Exhibits Nine and Twelve show a back view and a front view respectively of Sexton's body after it was pulled from the river. State's Exhibit Thirteen apparently shows a closeup view of the gunshot wound in Sexton's chest. Two of the complained of photographs are three and one/half by five inches, while the others are four by six inches. The copies contained in the record are black and white. Without objection, Dr. Charles Odom ("Odom"), the pathologist who conducted the autopsy on Sexton's body, described the external condition of the body in the following manner:

> ... The body was in a moderated state of decomposition when it arrived in the lab. Having undergone probably several weeks of decompositional changes with loss of surface hair, production of malodorous gases from the activity of bacteria working on the body. And also some depredation scavenging by wild animals as it laid exposed. So the body was not fresh in the sense that the individual had not died within the last day, but had died several weeks before
> ....

Well, the principle finding was that there was a gunshot wound of entry that involved the left chest, a little below the chest and to the left of the midline but in the rib cage region.

The photographs have probative value because they show the wounds inflicted upon Sexton and the condition and location of Sexton's body when it was discovered by the authorities. *Williams,* 958 S.W.2d at 196; *Jones v. State,* 843 S.W.2d 487, 501 (Tex.Crim.App.1992); *see Harrison v. State,* 501 S.W.2d 668, 669 (Tex.Crim.App. 1973) (defendant cannot "deprive State of the duty and function of presenting to the jury all relevant evidence, nor avoid facing the full facts of the crime"). Further, the photographs are visual depictions of matters testified to Odom. *Jones,* 944 S.W.2d at 652. Appellant does not allege any tampering, enhancement, or attempt by the State to inflame, confuse or mislead the jury in its presentation of the photographs. *Sonnier,* 913 S.W.2d at 519. Although the photographs are gruesome, that fact alone does not render photographs more prejudicial than probative. *Shavers v. State,* 881 S.W.2d 67, 77 (Tex. App.—Dallas 1994, no pet.). The photographs depict no more than the injuries inflicted upon the victim and are no more gruesome than the facts of the offense itself. *Williams,* 958 S.W.2d at 196; *Sonnier,* 913 S.W.2d at 519. For the foregoing reasons, we conclude that the trial court did not abuse its discretion in concluding that the probative value of the complained of photographs was not substantially outweighed by the danger of unfair prejudice. Issue ten is overruled.

The judgment of the trial court is *affirmed.*