Jackie Dewayne ANDREWS, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–00–00257–CR.

Court of Appeals of Texas,
Tyler.

Feb. 6, 2002.

Discretionary Review Dismissed
July 31, 2002.

James Volberding, Baynham & Volberding, Tyler, for appellant.

Edward J. Marty, Tyler, for state.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

JIM WORTHEN, Justice.

Jackie Dewayne Andrews ("Appellant") appeals his conviction for capital murder following a jury trial. He was assessed life imprisonment by the trial court. Ap-

pellant now raises on appeal three issues attacking the sufficiency of the non-accomplice evidence and alleging that evidence showing Appellant had stolen the murder weapon in an earlier robbery was more prejudicial than relevant. We affirm.

## BACKGROUND

Bo Hinton ("deceased") was murdered on the morning of August 18, 1999, during a robbery at Loving's Food Store in Tyler. Six shots from a Rohm .22 caliber six-shot revolver were found in the deceased's body. Further, abrasions and scrapes on the deceased's body indicated a violent physical struggle had occurred during the robbery and murder. Accomplice testimony by Appellant's cousin Charles Miller ("Miller") showed Appellant, Thadeus Davis ("Davis"), and Cornelius Timbs ("Timbs") had stolen the murder weapon in a robbery twelve days earlier. Miller further testified that during three meetings following August 6, Appellant had led the planning of the robbery of the deceased.

Appellant testified that he, Davis and Edward Hill ("Hill") had entered the store prior to the deceased's murder, but he did not know that Davis and Hill were planning to rob and kill Hinton. The deceased's blood was found on clothing of Appellant, Davis and Hill when they were arrested less than an hour after the deceased's murder. Further, money taken from the deceased during the time of the robbery and murder was found on each of the three at the time of their arrest. The jury found Appellant guilty of capital murder and the court sentenced him to life imprisonment.

## SUFFICIENCY OF THE EVIDENCE

Appellant contends in his first two issues that non-accomplice evidence is legally and factually insufficient to sustain his conviction for capital murder. Appellant specifically argues that without the accomplice testimony of Miller and Timbs, the State failed to show he intentionally caused the death of the deceased during the robbery. The State does not dispute that Miller and Timbs are accomplice witnesses.

## APPLICABLE LAW

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PEN.CODE ANN. § 19.02(b)(1) (Vernon 1994). A person commits the offense of capital murder if he intentionally commits the murder in the course of committing or attempting to commit robbery. TEX. PEN.CODE ANN. § 19.03(a)(2) (Vernon 1994). The relevant portions of section 7.02 of the Texas Penal Code state:

(a) A person is criminally responsible for an offense committed by the conduct of another if:

\* \* \*

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

\* \* \*

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. TEX. PEN.CODE ANN. § 7.02(a)(2), (b) (Vernon 1994).

The Texas Code of Criminal Procedure states:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979).

 Although Appellant characterizes his issues as attacks on the legal and factual sufficiency of the evidence, we do not review the legal and factual sufficiency of corroborative evidence. *Cathey v. State,* 992 S.W.2d 460, 462–63 (Tex.Crim.App. 1999); *Sexton v. State,* 51 S.W.3d 604, 611 (Tex.App.-Tyler 2000, no pet.). The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witnesses and then to examine the evidence of other witnesses to ascertain if there is evidence of incriminating character which tends to connect the defendant with the commission of the offense. *Reed v. State,* 744 S.W.2d 112, 125 (Tex.Crim.App.1988). If there is such evidence the corroboration is sufficient; otherwise, it is not. *Id.* Each case must be analyzed on its own facts and circumstances. *Gill v. State,* 873 S.W.2d 45, 48 (Tex.Crim.App.1994). There must simply be some non-accomplice evidence which tends to connect Appellant to the commission of the offense alleged in the indictment. *Id.* Evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex.Crim.App. 1997). Further, accomplice testimony need not be corroborated as to every element of the offense charged. *See id.*

## ACCOMPLICE TESTIMONY

Two accomplices, Miller and Timbs, testified for the State. Miller was a cousin of both Appellant and Davis. He testified that he had known them both all of his life. Miller testified that he had been involved when Appellant and Davis robbed John Lee on August 6. Miller testified that one of the items taken in the robbery of Lee was the Rohm .22 caliber handgun which was later used to murder the deceased.

Miller testified that a couple of days after the murder weapon was stolen from Lee that he, Appellant, Davis, and Timbs discussed a planned robbery of the deceased at Loving's Food Store. This meeting took place in the backyard of Betty Andrews' house at 1615 N. Spring. Miller further testified that Appellant had come up with the idea of robbing Loving's Food Store "because they have a lot of money in the back." Miller testified that each of the participants at this first strategy session to rob Loving's Food Store agreed to be a part of the plan.

Miller also testified to riding in a car with Appellant and Timbs around Loving's Food Store where details of the planned robbery were discussed. Miller further described another planning session for the robbery at the home where Hill lived. At this meeting, Appellant, Davis, Hill and Miller were present. Miller testified that he expressed concerns about robbing the deceased because it was known that he had a gun. Further, he testified that the deceased had been very helpful to his mother and family and had even loaned them groceries in the past when they were in need. Miller testified that it was after this meeting on Sunday, August 15, that he walked over to his father's house and asked him to take him to Frankston, a town about twenty-five miles south of Tyler. Miller said that he stayed at his girlfriend, Demetria Crear's, house in

Frankston until after the robbery and murder of the deceased which occurred on August 18.

Timbs testified that he was at the first planning meeting to rob Loving's Food Store held in the backyard of Betty Andrews' house at 1615 North Spring.[1] Timbs testified that Appellant was the leader of the discussion to rob Loving's Food Store. He said that Appellant wanted to take this action because it was known that the deceased kept a lot of money in the store. Timbs further testified that Appellant specifically asked him to drive Timbs' mother's car as the getaway car from the scene of the planned robbery of Loving's Food Store.

Timbs testified that Appellant brought up the robbery the second time when Appellant was driving Betty Andrews' car in front of Loving's Food Store. Timbs said that he and Miller were passengers in the car when Appellant showed Timbs where he wanted him to park his mother's car while the rest of them ran in and robbed the store. Timbs testified that Appellant indicated that a gun would be used in the robbery. Timbs testified that he did not take part in the strategy session for the robbery at Edward Hill's house nor did he take part in the August 18 robbery and murder.

## NON-ACCOMPLICE TESTIMONY

Curtis Lowe testified that he had driven by Loving's Food Store about 8:00 a.m. on August 18 while he was on his way to the post office. Lowe testified that as he passed by the house of Gloria Wickware, less than a block away from Loving's Food Store on North Church Street, that he honked his horn at Appellant who was sitting on a car with two other young men.

Lowe testified that when he returned from the post office and entered Loving's Food Store about 8:20 a.m. that Appellant and the other two men were still sitting on the same car on 1802 North Church Street. Lowe said that when he left Loving's Food Store around 8:30–8:35 a.m. he saw Appellant and the two men with him approaching the store. He testified that no one was in the store when he left it other than the deceased.

Detective Steven Risinger of the Tyler Police Department testified that he arrived at Loving's Food Store between 8:30 and 9:00 a.m. after responding to a 911 call. With three other Tyler police officers, he entered the store to find the deceased lying on the floor. Risinger testified that it was apparent that a struggle had occurred in the living quarters and office of the store from the objects knocked over, drawers opened and blood splattered about. While he and the other officers were investigating this crime scene, Sergeant Bill Goecking of the Tyler Police Department directed him to follow a red car whose driver had said he knew where the suspects for this crime were hiding. Risinger then followed this red car to the home of Betty Andrews at 1615 North Spring Street. Upon approaching the residence, a young black male, later identified as Hill, ran off. While other officers gave chase to Hill, Risinger handcuffed Davis who was in front of the residence with Chilton Dews ("Dews"). Appellant and his mother, Betty Andrews, finally exited from her house at 1615 North Spring after numerous verbal commands by Risinger. Risinger personally recovered a large amount of cash from Davis, and other offi-

---

1. Timbs identified only Appellant, Miller, and himself being at this meeting. He did not identify Davis as being present.

cers recovered similar amounts of cash from Appellant and Hill.

Three citizens who live near Loving's Food Store testified that during this mid-morning period of time, they had seen three black males running from the direction of Loving's Food Store and jumping fences in the process. Dews, uncle of both Appellant and Davis, and brother of Betty Andrews, testified that as he sat on his sister's car in her yard at 1615 North Spring, Appellant approached him from the alleyway. He said that shortly after Appellant arrived, Davis and Hill followed Appellant to where he was sitting on the car. Dews said that Appellant went into his mother's house while Davis and Hill went around the side of the house. Dews then testified that when Davis and Hill returned from the side of the house, the police arrived on the scene. Dews testified it was at this time that Hill began running and that Davis was arrested on the spot.

Hill was quickly apprehended by Tyler police officers after a foot chase through the nearby neighborhood. During this foot chase, these officers had observed Hill throw down a rubber glove. Later, Sergeant David Long testified that the powder-free synthetic latex glove which Hill had thrown down during the foot chase matched the box of gloves located at 1615 North Spring Street. The clothing of Hill, Davis and Appellant was found covered with blood. It was later determined after DNA testing that the blood belonged to the deceased.

Officer James Cooper of the Tyler Police Department, who processed the crime scene, testified that he found the Rohm .22 caliber six-shot revolver behind a house on North Church Street. Officer Cooper testified that when he found the

revolver it contained six fired .22 caliber casings. Lee identified this .22 caliber gun as the weapon which had been stolen from him on August 6, 1999. David Dolinak, a forensic pathologist, testified that when performing the autopsy on the deceased, he found what he believed to be six gunshot wounds.[2] Dolinak further testified that he found evidence of blunt-force trauma in addition to the six gunshot wounds. He described these as scrapes, abrasions, and lacerations in the deceased's head and upper body. He concluded that the deceased had died by violent means. Travis Spinder of the Southwestern Institute of Forensic Science ("SWIFS") further identified bullets found in and around the deceased as being fired from a .22 caliber gun. Tim Caliput, also with SWIFS, testified that the blood found on the clothing of Appellant, Davis, and Hill at the time of their arrest matched that of the deceased.

Appellant was the sole defense witness during trial. He testified that he had spent the night at the home of Davis. He said that when they arose that morning they had gone down to Hill's house. There, Appellant testified that Hill brought out the .22 caliber revolver which had been stolen from Lee on August 6. He said that Hill and Davis had taken the gun to the side of the house and shot it. Appellant testified that he also purchased some marijuana from Hill while at the Hill house. He said that Hill smoked some marijuana while they were there but that he saved his until they arrived next at his mother's house at 1615 North Spring Street. Appellant testified that after smoking marijuana with Hill and Davis at his mother's house, they decided to go to Loving's Food Store. Appellant testified that the plan

---

**2.** Dolinak testified that there was evidence of a shot each in the head, chest, upper back, and left thigh. He found evidence of two shots in the deceased's left forearm.

was for him to buy some cigarettes for Hill who was only sixteen years of age at the time. Appellant testified that as the threesome headed toward Loving's Food Store they stopped at the house of his aunt, Gloria Wickware. After spending some time at his aunt's home located less than a block from the store, Appellant testified that he told the other two, "Come on, let's go to Loving's."

Appellant testified that once inside the store, he headed to the back to purchase a soda. He said at this time he heard shots and saw Hill shooting the deceased. Appellant testified that he tried to exit the store at this point, but that Hill pointed the gun at him and told him to open up a drawer containing money, which he did. Appellant then testified that as he was trying to leave the store's office, the deceased was trying to come into it. He said the deceased grabbed him and that he tried to get the deceased off of him. He said that Davis and Hill also tried to get the deceased off of him and that Hill was swinging his gun at the deceased while Davis was on the deceased's back. He said that Hill and Davis thought that they had freed him from the deceased only to have the deceased grab him again. Appellant said that it was at this time that Hill began shooting the deceased again and that he finally let go of him.

Appellant said that it was at this time that he ran out of the store, followed by Hill and Davis. He said that they were running and jumping over fences and eventually made it to his mother's house at 1615 North Spring. He said that after he went into the house, Davis and Hill went to the side of the house and knocked on the side door. Appellant testified that he did not let them in. He testified that soon the police arrived and Hill ran off. Appellant testified that his mother had difficulty in opening the latch leading outside but that he was able to unlatch the door so they could come outside where he was arrested by the police.

### SUFFICIENCY OF CORROBORATION TESTIMONY

The non-accomplice testimony of Curtis Lowe established that Appellant was casing Loving's Food Store immediately prior to the commission of the robbery and murder there. Three neighborhood residents saw three young black men running from Loving's Food Store and jumping fences shortly after the robbery and murder had been committed. Chilton Dews, Appellant's uncle, saw him in the company of Davis and Hill shortly after the crime occurred.

Appellant himself testified that Hill and Davis had been shooting the murder weapon before they went to the store that morning. He further corroborated that the murder weapon had been stolen from John Lee. Most importantly, Appellant placed himself in the store with Davis and Hill while the robbery and murder were occurring. Appellant admitted running from the crime scene with Davis and Hill. Appellant admitted having $301.00 of the cash taken from the store at the time of his arrest. Further, the deceased's blood was on Appellant's clothing.

■ We hold that the non-accomplice testimony along with that of Appellant sufficiently connects Appellant to the capital murder in this case. *See Reed,* 744 S.W.2d at 125. Appellant's issues one and two are overruled.

### ADMISSION OF EXTRANEOUS OFFENSE EVIDENCE

In his third and final issue, Appellant contends the trial court erred in admitting evidence of an extraneous offense. He argues that the evidence that the .22 caliber gun used in the robbery and murder of deceased was taken in the robbery of John

Lee on August 6 constituted evidence of an extraneous offense that was not relevant to the issue of whether Appellant was guilty of capital murder.

 Admission of extraneous offense evidence is generally within the trial court's discretion. *Montgomery v. State,* 810 S.W.2d 372, 390 (Tex.Crim.App.1990) (op. on reh'g). The general rule is that evidence of other crimes, wrongs or acts is inadmissible to prove a person's character, but evidence of other crimes, wrongs or acts is admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. Tex.R. Evid. 404(b). If a rule 404(b) objection is made to extraneous offense evidence, the proponent of the evidence must persuade the trial court that the evidence has relevance apart from character, conformity, e.g., that it tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing the absence of mistake or accident. *Montgomery,* 810 S.W.2d at 387–88; *Powell v. State,* 5 S.W.3d 369, 383 (Tex. App.-Texarkana 1999, pet. ref'd).

Texas Rule of Evidence 401 defines relevant evidence as that evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex.R. Evid. 401. All relevant evidence is generally admissible. Tex.R. Evid. 402. Here, the evidence concerning the murder weapon was relevant to show preparation leading to the robbery of Loving's Food Store. It further showed the opportunity to commit the crime as planned by Appellant and the other perpetrators. Tracing how they obtained the murder weapon was a "fact of consequence" in this case. *See Rankin v. State,* 974 S.W.2d 707, 709 (Tex.Crim.App.1996). Additionally, this evidence tends to rebut Appellant's testimony that he did not know Davis and Hill were planning to rob and kill the deceased. We hold that the trial court did not abuse its discretion in admitting the evidence of how Appellant obtained the murder weapon. Appellant's issue three is overruled.

The judgment of the trial court is *affirmed.*