COURT
OF APPEALS

SECOND DISTRICT
OF TEXAS

FORT WORTH

 

 

NO. 2-07-024-CR

 

 

 

ISSAC MENDEZ                                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                               STATE

 

------------

 

FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM
OPINION[1]

 

------------

I.  Introduction

Appellant Issac Mendez
appeals his convictions for engaging in organized criminal activity and
murder.  In one point, Issac contends
that the convictions are based on uncorroborated accomplice witness testimony,
and, therefore, insupportable.  We will
affirm.

 








II.  Factual and Procedural Background

At approximately 3:26 in the
early morning hours of June 26, 2005, there was a drive-by shooting in east
Fort Worth.  Four people were shot.  One of those four, Dianette Sanchez, a mother
of three young children, later died from her injuries. 

In late September 2005, the
police arrested three people in connection with the shootingCMonica Gauna, Brian Hernandez, and Issac Mendez.  Monica accepted a plea bargain wherein she
agreed to testify against Issac and Brian in exchange for ten years of
community supervision.  At trial, Monica
testified that she directed Issac, the driver, to the house where the shooting
occurred. Brian was also in the car.  She
stated that they initially drove by the house to confirm that people were home,
and that, in fact, they saw several people in the front yard of the house.  Monica said that Issac went around the block,
pulled out a gun, and gave it to Brian. 
According to Monica, Issac then drove back by the house as Brian opened
fire on the crowd.  

At the conclusion of the
trial, the jury found Issac guilty of engaging in organized criminal activity
and of murder.  After the punishment
hearing, the jury assessed a life sentence against Issac on each count, and the
trial court entered a judgment consistent with the jury=s findings.  Issac now appeals.

 








III.  Testimony From an Accomplice

A.     The Accomplice Witness Rule

Article 38.14 of the code of
criminal procedure establishes that Aa conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.@  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). 

In determining whether an
accomplice witness=s testimony
is corroborated, the appellate court must eliminate all accomplice evidence
from the record and determine whether the other inculpatory facts and
circumstances in evidence tend to connect the appellant to the offense.  Munoz v. State, 853 S.W.2d 558, 559
(Tex. Crim. App. 1993).  An appellate
court is to look for corroboration in all non-accomplice evidence presented by
both the prosecution and defense.  Reed
v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988); Adams v. State,
180 S.W.3d 386, 415 (Tex. App.CCorpus Christi 2005, no pet.).








Furthermore, such evidence
may be either circumstantial or direct, and apparently insignificant
incriminating circumstances may sometimes afford satisfactory evidence of
corroboration.  Munoz, 853 S.W.2d
at 559; Reed, 744 at 126.  For
example, evidence merely showing the motive or opportunity of the accused to
commit the crime is insufficient alone to corroborate the accomplice
witness.  Reed, 744 S.W.2d at
127.  It may, however, be considered in
connection with other evidence tending to connect the accused with the
crime.  Id.  

Corroborative evidence need
not establish an appellant=s guilt of the charged offense nor directly link the appellant to the
offense, but is sufficient if it tends to connect the appellant to the
offense.  Munoz, 853 S.W.2d at
559; Reed, 744 at 126.  Therefore,
we apply the Atending to
connect@ standard of review, rather than the traditional standards for legal
and factual sufficiency, when reviewing evidence for compliance with article
38.14.  Solomon v. State, 49
S.W.3d 356, 361 (Tex. Crim. App. 2001).

B.     Monica=s Accomplice Witness Testimony

Monica testified that in the
late night hours of June 25, 2005, she was working at her parent=s bar, Dos Amigos.  After
midnight, a large party of people came to Dos Amigos.  Two men named Jesse Salinas, Jr. and Randy
Luna were part of the group.  Monica was
in a relationship with Jesse.  Jesse and
Randy were members of the gang the Latin Kings. 








Shortly after the group
arrived, Monica=s mother had
Monica retrieve information on Jesse=s bar tab.  After evaluating
Jesse=s tab, Monica=s mother,
Jesse, and Randy became engaged in an argument over Jesse=s bill.  That argument evolved
into a physical altercation among several people at the bar.  Danny Diaz, Monica=s brother, was involved in the altercation and, in fact, sustained a
deep cut on his right forearm during the fight. 

After the fight ended, Monica
drove Danny to the hospital.  At the
hospital, Monica and Danny called Angela Martinez (Danny=s girlfriend), Brian, and Issac, who all arrived at the hospital
shortly thereafter.  Danny told Brian and
Issac that Ahe had got
shanked by some Latin Kings.@  Danny, Brian, and Issac were
all members of the gang Sur Trece. 

After waiting for a while at
the hospital, the group decided that Danny would receive faster service at a
different hospital.  So Angela took Danny
to another hospital, while Monica left with Issac, and Brian, who had come to
the hospital in his own vehicle, went to drop his car off at his house.  When they left, Monica said, their
understanding was that they (Monica, Brian, and Issac) were going to go from
the hospital to Jesse=s house,
where they would perform a drive-by shooting. 
They were to use Issac=s car for the drive by.  The
State showed Monica a picture of Issac=s car, which was a 1990s-model black Nissan with tinted windows and a
sunroof; Monica identified the vehicle as Issac=s car and the picture was admitted into evidence. 








From the hospital, Issac and
Monica followed Brian to his house, where Brian parked his car and got into the
car with Monica and Issac.  From Brian=s house, Issac drove to his own apartment; Issac briefly entered his
apartment before leaving for Jesse=s house.  From Issac=s apartment, Monica directed Issac to Jesse=s house.  

Once they found Jesse=s house, Issac drove past the house to make sure that people were
home.  Monica testified that they saw a
large group of people Amilling
around@ in front of the house.  Issac
made two right turns and parked the car. 
At that point, Monica testified, Issac pulled a semi-automatic gun out
from under the seat of his car.  Brian,
who had put on latex gloves, wiped down the gun and cleaned the bullets. 

After Brian had prepared the
gun, Issac drove the car back toward the house. 
As they approached the house, Issac slowed down and Ahit the lights@ while Brian
went up through the sunroof on Issac=s car and opened fire.  Monica
testified that she saw shots being fired back from the house toward the car. 








From Jesse=s house, the three went back to Issac=s apartment, where they met up with a girl named Melissa accompanied
by Asome guy.@  A man named Rick was also at the
apartment.  Monica, who had been smoking
marijuana, taking Xanax bars, and drinking, could not remember how she got home
that night, but remembered being woken up later that morning by the police at
her house.   

C.     The Non-Accomplice Witness Testimony

1.     Angela Martinez

Apart from Monica, the jury
heard from several other witnesses, presented by both the State and the
defense.  One of those witnesses was
Angela Martinez, who was Danny=s girlfriend and at the hospital with Danny, Monica, and Brian in the
early morning hours of June 26, 2005. 
Angela could not say for sure that she had seen Issac at the
hospital.  This is because Issac has an
identical twin brother, and it was difficult for Angela to say whether it was
Issac or his twin at the hospital that night. 
However, she testified, either Issac or his twin was at the hospital
that night. 

When the group decided to
leave the hospital and go to a different hospital, Angela testified that she
and Danny got into Danny=s car, the
twin got into Alike a black
maybe Nissan or something like that,@ Brian got into a gold car, and she did not see where Monica
went.  Angela testified that she did not
know anything about a planned shooting. 

2.     Randy Luna








The jury also heard the
testimony of Randy Luna, Jesse=s cousin, who verified that he was a member of the Latin Kings.  Randy was at Dos Amigos when the original
fight broke out and at Jesse=s house when the shooting occurred. 
Randy testified that his family was celebrating the birthday of Jesse=s sister, Michelle Salinas, and that the party started out at one bar,
moved to Dos Amigos, and, after the fight at Dos Amigos, moved to the house
where Jesse and his family lived. 
Shortly after he arrived at the house, Angela Buxton, Randy=s girlfriend, told Randy that the Angela dating Danny (Angela
Martinez) had called and said that Randy was going to die, a threat that Randy
did not take seriously.  Angela Buxton
also testified to the conversation between herself and Angela Martinez, during
which Angela Martinez told Angela Buxton that Randy was going to die. 

After Randy spoke with his
girlfriend, he and Jesse broke off from the rest of the group and went to a
corner of the yard.  Not long afterwards,
the shooting occurred.  Randy testified
that as soon as he heard the shots, he dropped to the ground but that he looked
up and saw the car pass by.  Randy said
that the car passed under a street light, allowing him to see the entire car,
which he described as a black Mazda 626 or Nissan Maxima.  Randy stated that he recognized the car as
soon as he saw it.  He explained that the
car had distinctive tire rims, which, as someone who had worked at tire stores
for approximately ten years, he had noticed in the past and then recalled at
the time of the shooting. 








Randy further stated that he
knew the car belonged to one of Athe twins@ and that,
while he did not know which twin it belonged to, he only ever saw Issac driving
the car both before and after the shooting. 
In fact, Randy testified that as he and his girlfriend were going to
work on the Monday after the shooting, he passed by a parking lot and pointed
out the car to his girlfriend, saying, AThere goes that car that came by the house.@  Issac was getting into the
car. 

When questioned about his
ability to distinguish between Issac and his identical twin, Randy stated that
he could tell the difference between the twins because he had spent some time
with them and knew that one was thinner than the other.  Randy stated that while he did not know the
twins by name, he knew that the bigger of the twins was the one in the
courtroom at trial and that it was the bigger one he always saw driving the
car.  At trial, Randy proved his ability
to tell the twins apart by distinguishing them in photos when cross-examined by
the defense. 

3.     Rick Smith and Melissa Lopez

Although their testimony
placed Issac at his apartment at the time of the shooting, both defense
witnesses Rick Smith and Melissa Lopez testified that they met up with Issac at
his apartment in the early morning hours of June 26, 2005.  Melissa verified that Issac was driving his
black Maxima that night. 








4.     Michelle Salinas

Michelle Salinas is Jesse
Salinas=s younger sister and was at the house the night of the shooting.  Michelle testified that the car used in the shooting
was a dark car with shiny tire rims. 
Furthermore, Michelle stated, she noticed the car that night before the
shooting and noted that the car moved from the right to the left lane and
turned off its lights right before the shooting started. 

5.     Officer Eloy Morales

The jury additionally heard
the testimony of several police officers who were involved in this case.  Officer Eloy Morales was the first patrol
officer dispatched to the scene of the shooting at 3:26 a.m. on June 26,
2005.  Officer Morales testified about
how he preserved the crime scene and requested a crime scene investigator.  The officer also spoke with people at the
scene, who said that a dark-colored vehicle was used in the drive-by shooting.  Officer Morales also spoke with Jesse Salinas,
Sr., who said that he had fired shots back at the car. 

6.     Officer David Ukle








Officer David Ukle was the
crime scene investigator at the scene that morning.  Officer Ukle said that he recovered two sets
of bullet casings from the sceneCa .40 caliber casing and a nine-millimeter casing.  Officer Ukle determined that the nine-millimeter
bullets were fired toward the house and that the .40 caliber bullets were fired
from the house toward the street.  Both
casings, Officer Ukle said, were from semi-automatic guns. 

Officer Ukle additionally
testified that there are several steps to preparing a semi-automatic gun for
firing.  The casings recovered from the
crime scene, Officer Ukle said, did not have any fingerprints on them.  He testified that a person could wipe down
the bullets and cartridge casings and that such is done to make identification
difficult. 

7.     Michael Ward

Michael Ward, a forensic
scientist, examined the bullet casings that Officer Ukle recovered from the
scene.  Ward compared the casings to the
guns that Jesse Salinas, Sr. had given to the police and determined that the
.40 caliber casings were from Salinas=s gun and that the nine-millimeter casings were from an unidentified
gun.  Ward additionally testified that a
nine-millimeter bullet had killed Dianette. 

8.     Detective Roger Iker








Detective Roger Iker was the
detective originally placed on the case on June 26, 2005.  Detective Iker testified that witnesses on
the scene saw the shots fired from a black car with a sunroof and tinted
windows.  The witnesses also revealed to
the detective that the car had 17-inch custom tire rims, a squared-off back
end, and was generally described as being an early >90s model car, Alike the early
>90s Mitsubishi Galant [or] Nissan Maxima.A   

In his investigation,
Detective Iker discovered that people from the Salinas party had been involved
in a bar fight at Dos Amigos.  Working
off of the theory that the shooting was in retaliation for the fight, the
detective looked up the owners of the barCthe GaunasCand, later
on the morning of June 26, went to their house, where he questioned Monica,
Danny, and Danny=s
father.  Detective Iker stated that, at
the Guanas= house, he
noticed that Danny=s hand was
bandaged, and, when questioned, Danny said that had been cut in a fight at the
bar the night before. 

9.     Detective John McCaskill








Detective John McCaskill was
the officer who took over the investigation when Dianette passed away. (She was
not killed on the scene, but died five weeks later at the hospital from her
injuries.)  Detective McCaskill testified
that three to four days before the shooting, Issac filed a police report
stating that someone had broken into his car. 
In the report, Issac described his car as a 1990 black Nissan
Maxima.  The detective also said that he
questioned Angela Martinez about the car that Monica got into at the hospital
on June 26, 2005.  According to detective
McCaskill, Angela said that Monica had gotten into the car with one of the
twins.  When shown a picture of Issac=s car, Angela identified it as the car in which Monica had left the
hospital. 

Detective McCaskill also
testified about how, during the course of his investigation, he looked into the
phone calls made from Monica=s phone on June 26.  The
detective noticed that she had made calls to Brian Hernandez.  He also stated that before he spoke with
Monica, he had been given Issac=s and Brian=s names as
people involved in the shooting, and that Monica=s name was provided by a third party later in the investigation. 

D.     Analysis of the Non-Accomplice Testimony

Eliminating all of Monica=s accomplice testimony from the record,[2]
the non-accomplice evidence in this case is more than sufficient to meet the
corroboration requirements of article 38.14. 
See Tex. Code Crim. Proc.
Ann. art. 38.14; Munoz, 853 S.W.2d at 559.  Randy=s testimony established that there was a bar fight that night at Dos
Amigos, and Detective Iker=s testimony established that, the next morning, Danny=s hand was bandaged and Danny explained that it was cut in a fight at
the bar.  This evidence supported the
motive that Monica had provided for the shooting.








Detective McCaskill=s testimony regarding Monica=s cell phone records supported Monica=s claim that she had called Brian after the bar fight, and Angela
Martinez=s testimony established that Brian and one of Athe twins@ were at the
hospital with Danny and Monica that night. 
Furthermore, Angela Martinez told Detective McCaskill that Monica had
left the hospital with the twin and had additionally identified Issac=s car as the car in which Monica had ridden.  Angela=s own testimony was that the twin left in a black Nissan.  

Randy and Angela Buxton also
testified about a cell phone call made by Angela Martinez to Angela Buxton that
night in which Martinez stated that Randy was going to die.  This testimony corroborated Monica=s claim that there was a plan to go to Jesse=s house and commit a shooting.  

There was also ample
testimony about Issac=s car being
the one involved in the drive-by shooting. 
Detective McCaskill=s testimony about the police report that Issac had filed four days
before the shooting established that Issac claimed ownership of a 1990 black
Nissan Maxima.  Officer Morales=s and Detective Iker=s testimony was that witnesses at the scene said that a car exactly
matching the description of Issac=s carCa black
early >90s Nissan MaximaCwas involved in the shooting.








Additionally, Randy=s testimony independently established that Issac=s car was the one involved in the shooting.  Randy=s testimony that he recognized the distinctive tire rims on the car,
immediately knew who the car belonged to, and saw Issac driving the car the day
after the shooting by itself connected Issac to the shooting.  See Munoz, 853 S.W.2d at 559.

Even the smallest of details
in Monica=s testimony
were corroborated.  For example, Monica=s testimony that Issac turned off the car=s headlights immediately before Brian started shooting was exactly
corroborated by Michelle.  Additionally,
Monica=s testimony that someone fired shots back at the car was corroborated
by Officer Morales, who said that Jesse Salinas, Sr. admitted to firing at the
car as it sped away.  

Forensic evidence also
corroborated Monica=s
story.  Michael Ward, the forensic
scientist, stated that he determined that the bullets fired toward the house
came from a nine-millimeter semi-automatic gun. 
Monica had stated that Issac gave Brian a semi-automatic.  Also, Ward testified that the bullet casings
did not have any fingerprints on them, which corroborated Monica=s testimony about Brian cleaning them beforehand.

The testimony of Rick Smith
and Melissa Lopez additionally corroborated Monica=s testimony that, after the shooting, she returned to Issac=s apartment where they met up with a lady named Melissa and a man
named Rick.  Finally, Monica=s testimony that she was awakened by the police later that morning was
verified by Detective Iker.








All of this non-accomplice
testimony amounts to at least some evidence tending to connect Issac to the
drive-by shooting and murder of Dianette and the associated organized criminal
activity offense.  See Solomon, 49
S.W.3d at 361.  The corroboration
requirements of article 38.14 were therefore met in this case. See Tex. Code Crim. Proc. Ann. art. 38.14; Solomon,
49 S.W.3d at 361.  Accordingly, we hold
that the State presented sufficient non-accomplice corroborating evidence to
support accomplice Monica Guana=s testimony and overrule Issac=s sole point.

IV.  Conclusion

Having overruled Issac=s sole point, we affirm the trial court=s judgment.

 

 

PER CURIAM

 

PANEL F:    WALKER, J.; CAYCE, C.J.; and MCCOY, J.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
March 20, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]That
Monica was an accomplice is not disputed.