

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-024-CR

ISSAC MENDEZ                                                          APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

------------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Issac Mendez appeals his convictions for engaging in organized criminal activity and murder.  In one point, Issac contends that the convictions are based on uncorroborated accomplice witness testimony, and, therefore, insupportable.  We will affirm.

---

[1] *See* TEX. R. APP. P. 47.4.

## II. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 3:26 in the early morning hours of June 26, 2005, there was a drive-by shooting in east Fort Worth. Four people were shot. One of those four, Dianette Sanchez, a mother of three young children, later died from her injuries.

In late September 2005, the police arrested three people in connection with the shooting—Monica Gauna, Brian Hernandez, and Issac Mendez. Monica accepted a plea bargain wherein she agreed to testify against Issac and Brian in exchange for ten years of community supervision. At trial, Monica testified that she directed Issac, the driver, to the house where the shooting occurred. Brian was also in the car. She stated that they initially drove by the house to confirm that people were home, and that, in fact, they saw several people in the front yard of the house. Monica said that Issac went around the block, pulled out a gun, and gave it to Brian. According to Monica, Issac then drove back by the house as Brian opened fire on the crowd.

At the conclusion of the trial, the jury found Issac guilty of engaging in organized criminal activity and of murder. After the punishment hearing, the jury assessed a life sentence against Issac on each count, and the trial court entered a judgment consistent with the jury's findings. Issac now appeals.

### III. TESTIMONY FROM AN ACCOMPLICE

## A.   The Accomplice Witness Rule

Article 38.14 of the code of criminal procedure establishes that "a conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005).

In determining whether an accomplice witness's testimony is corroborated, the appellate court must eliminate all accomplice evidence from the record and determine whether the other inculpatory facts and circumstances in evidence tend to connect the appellant to the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). An appellate court is to look for corroboration in all non-accomplice evidence presented by both the prosecution and defense. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988); *Adams v. State*, 180 S.W.3d 386, 415 (Tex. App.—Corpus Christi 2005, no pet.).

Furthermore, such evidence may be either circumstantial or direct, and apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *Munoz*, 853 S.W.2d at 559; *Reed*, 744

at 126.  For example, evidence merely showing the motive or opportunity of the accused to commit the crime is insufficient alone to corroborate the accomplice witness.  *Reed*, 744 S.W.2d at 127.  It may, however, be considered in connection with other evidence tending to connect the accused with the crime.  *Id.*

Corroborative evidence need not establish an appellant's guilt of the charged offense nor directly link the appellant to the offense, but is sufficient if it tends to connect the appellant to the offense.  *Munoz*, 853 S.W.2d at 559; *Reed*, 744 at 126.  Therefore, we apply the "tending to connect" standard of review, rather than the traditional standards for legal and factual sufficiency, when reviewing evidence for compliance with article 38.14.  *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).

**B.    Monica's Accomplice Witness Testimony**

Monica testified that in the late night hours of June 25, 2005, she was working at her parent's bar, Dos Amigos.  After midnight, a large party of people came to Dos Amigos.  Two men named Jesse Salinas, Jr. and Randy Luna were part of the group.  Monica was in a relationship with Jesse.  Jesse and Randy were members of the gang the Latin Kings.

Shortly after the group arrived, Monica's mother had Monica retrieve information on Jesse's bar tab.  After evaluating Jesse's tab, Monica's mother,

4

Jesse, and Randy became engaged in an argument over Jesse's bill. That argument evolved into a physical altercation among several people at the bar. Danny Diaz, Monica's brother, was involved in the altercation and, in fact, sustained a deep cut on his right forearm during the fight.

After the fight ended, Monica drove Danny to the hospital. At the hospital, Monica and Danny called Angela Martinez (Danny's girlfriend), Brian, and Issac, who all arrived at the hospital shortly thereafter. Danny told Brian and Issac that "he had got shanked by some Latin Kings." Danny, Brian, and Issac were all members of the gang Sur Trece.

After waiting for a while at the hospital, the group decided that Danny would receive faster service at a different hospital. So Angela took Danny to another hospital, while Monica left with Issac, and Brian, who had come to the hospital in his own vehicle, went to drop his car off at his house. When they left, Monica said, their understanding was that they (Monica, Brian, and Issac) were going to go from the hospital to Jesse's house, where they would perform a drive-by shooting. They were to use Issac's car for the drive by. The State showed Monica a picture of Issac's car, which was a 1990s-model black Nissan with tinted windows and a sunroof; Monica identified the vehicle as Issac's car and the picture was admitted into evidence.

From the hospital, Issac and Monica followed Brian to his house, where Brian parked his car and got into the car with Monica and Issac. From Brian's house, Issac drove to his own apartment; Issac briefly entered his apartment before leaving for Jesse's house. From Issac's apartment, Monica directed Issac to Jesse's house.

Once they found Jesse's house, Issac drove past the house to make sure that people were home. Monica testified that they saw a large group of people "milling around" in front of the house. Issac made two right turns and parked the car. At that point, Monica testified, Issac pulled a semi-automatic gun out from under the seat of his car. Brian, who had put on latex gloves, wiped down the gun and cleaned the bullets.

After Brian had prepared the gun, Issac drove the car back toward the house. As they approached the house, Issac slowed down and "hit the lights" while Brian went up through the sunroof on Issac's car and opened fire. Monica testified that she saw shots being fired back from the house toward the car.

From Jesse's house, the three went back to Issac's apartment, where they met up with a girl named Melissa accompanied by "some guy." A man named Rick was also at the apartment. Monica, who had been smoking marijuana, taking Xanax bars, and drinking, could not remember how she got

6

home that night, but remembered being woken up later that morning by the police at her house.

### C. The Non-Accomplice Witness Testimony

#### 1. *Angela Martinez*

Apart from Monica, the jury heard from several other witnesses, presented by both the State and the defense. One of those witnesses was Angela Martinez, who was Danny's girlfriend and at the hospital with Danny, Monica, and Brian in the early morning hours of June 26, 2005. Angela could not say for sure that she had seen Issac at the hospital. This is because Issac has an identical twin brother, and it was difficult for Angela to say whether it was Issac or his twin at the hospital that night. However, she testified, either Issac or his twin was at the hospital that night.

When the group decided to leave the hospital and go to a different hospital, Angela testified that she and Danny got into Danny's car, the twin got into "like a black maybe Nissan or something like that," Brian got into a gold car, and she did not see where Monica went. Angela testified that she did not know anything about a planned shooting.

#### 2. *Randy Luna*

The jury also heard the testimony of Randy Luna, Jesse's cousin, who verified that he was a member of the Latin Kings. Randy was at Dos Amigos

7

when the original fight broke out and at Jesse's house when the shooting occurred. Randy testified that his family was celebrating the birthday of Jesse's sister, Michelle Salinas, and that the party started out at one bar, moved to Dos Amigos, and, after the fight at Dos Amigos, moved to the house where Jesse and his family lived. Shortly after he arrived at the house, Angela Buxton, Randy's girlfriend, told Randy that the Angela dating Danny (Angela Martinez) had called and said that Randy was going to die, a threat that Randy did not take seriously. Angela Buxton also testified to the conversation between herself and Angela Martinez, during which Angela Martinez told Angela Buxton that Randy was going to die.

After Randy spoke with his girlfriend, he and Jesse broke off from the rest of the group and went to a corner of the yard. Not long afterwards, the shooting occurred. Randy testified that as soon as he heard the shots, he dropped to the ground but that he looked up and saw the car pass by. Randy said that the car passed under a street light, allowing him to see the entire car, which he described as a black Mazda 626 or Nissan Maxima. Randy stated that he recognized the car as soon as he saw it. He explained that the car had distinctive tire rims, which, as someone who had worked at tire stores for approximately ten years, he had noticed in the past and then recalled at the time of the shooting.

8

Randy further stated that he knew the car belonged to one of "the twins" and that, while he did not know which twin it belonged to, he only ever saw Issac driving the car both before and after the shooting. In fact, Randy testified that as he and his girlfriend were going to work on the Monday after the shooting, he passed by a parking lot and pointed out the car to his girlfriend, saying, "There goes that car that came by the house." Issac was getting into the car.

When questioned about his ability to distinguish between Issac and his identical twin, Randy stated that he could tell the difference between the twins because he had spent some time with them and knew that one was thinner than the other. Randy stated that while he did not know the twins by name, he knew that the bigger of the twins was the one in the courtroom at trial and that it was the bigger one he always saw driving the car. At trial, Randy proved his ability to tell the twins apart by distinguishing them in photos when cross-examined by the defense.

### 3. Rick Smith and Melissa Lopez

Although their testimony placed Issac at his apartment at the time of the shooting, both defense witnesses Rick Smith and Melissa Lopez testified that they met up with Issac at his apartment in the early morning hours of June 26, 2005. Melissa verified that Issac was driving his black Maxima that night.

9

### 4. *Michelle Salinas*

Michelle Salinas is Jesse Salinas's younger sister and was at the house the night of the shooting. Michelle testified that the car used in the shooting was a dark car with shiny tire rims. Furthermore, Michelle stated, she noticed the car that night before the shooting and noted that the car moved from the right to the left lane and turned off its lights right before the shooting started.

### 5. *Officer Eloy Morales*

The jury additionally heard the testimony of several police officers who were involved in this case. Officer Eloy Morales was the first patrol officer dispatched to the scene of the shooting at 3:26 a.m. on June 26, 2005. Officer Morales testified about how he preserved the crime scene and requested a crime scene investigator. The officer also spoke with people at the scene, who said that a dark-colored vehicle was used in the drive-by shooting. Officer Morales also spoke with Jesse Salinas, Sr., who said that he had fired shots back at the car.

### 6. *Officer David Ukle*

Officer David Ukle was the crime scene investigator at the scene that morning. Officer Ukle said that he recovered two sets of bullet casings from the scene—a .40 caliber casing and a nine-millimeter casing. Officer Ukle determined that the nine-millimeter bullets were fired toward the house and that

10

the .40 caliber bullets were fired from the house toward the street.  Both casings, Officer Ukle said, were from semi-automatic guns.

Officer Ukle additionally testified that there are several steps to preparing a semi-automatic gun for firing.  The casings recovered from the crime scene, Officer Ukle said, did not have any fingerprints on them.  He testified that a person could wipe down the bullets and cartridge casings and that such is done to make identification difficult.

7.    *Michael Ward*

Michael Ward, a forensic scientist, examined the bullet casings that Officer Ukle recovered from the scene.  Ward compared the casings to the guns that Jesse Salinas, Sr. had given to the police and determined that the .40 caliber casings were from Salinas's gun and that the nine-millimeter casings were from an unidentified gun.  Ward additionally testified that a nine-millimeter bullet had killed Dianette.

8.    *Detective Roger Iker*

Detective Roger Iker was the detective originally placed on the case on June 26, 2005.  Detective Iker testified that witnesses on the scene saw the shots fired from a black car with a sunroof and tinted windows. The witnesses also revealed to the detective that the car had 17-inch custom tire rims, a

11

squared-off back end, and was generally described as being an early '90s model car, "like the early '90s Mitsubishi Galant [or] Nissan Maxima."

In his investigation, Detective Iker discovered that people from the Salinas party had been involved in a bar fight at Dos Amigos. Working off of the theory that the shooting was in retaliation for the fight, the detective looked up the owners of the bar—the Gaunas—and, later on the morning of June 26, went to their house, where he questioned Monica, Danny, and Danny's father. Detective Iker stated that, at the Guanas' house, he noticed that Danny's hand was bandaged, and, when questioned, Danny said that had been cut in a fight at the bar the night before.

9.    *Detective John McCaskill*

Detective John McCaskill was the officer who took over the investigation when Dianette passed away. (She was not killed on the scene, but died five weeks later at the hospital from her injuries.) Detective McCaskill testified that three to four days before the shooting, Issac filed a police report stating that someone had broken into his car. In the report, Issac described his car as a 1990 black Nissan Maxima. The detective also said that he questioned Angela Martinez about the car that Monica got into at the hospital on June 26, 2005. According to detective McCaskill, Angela said that Monica had gotten into the

12

car with one of the twins. When shown a picture of Issac's car, Angela identified it as the car in which Monica had left the hospital.

Detective McCaskill also testified about how, during the course of his investigation, he looked into the phone calls made from Monica's phone on June 26. The detective noticed that she had made calls to Brian Hernandez. He also stated that before he spoke with Monica, he had been given Issac's and Brian's names as people involved in the shooting, and that Monica's name was provided by a third party later in the investigation.

### D. Analysis of the Non-Accomplice Testimony

Eliminating all of Monica's accomplice testimony from the record,[2] the non-accomplice evidence in this case is more than sufficient to meet the corroboration requirements of article 38.14. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Munoz*, 853 S.W.2d at 559. Randy's testimony established that there was a bar fight that night at Dos Amigos, and Detective Iker's testimony established that, the next morning, Danny's hand was bandaged and Danny explained that it was cut in a fight at the bar. This evidence supported the motive that Monica had provided for the shooting.

---

[2] That Monica was an accomplice is not disputed.

13

Detective McCaskill's testimony regarding Monica's cell phone records supported Monica's claim that she had called Brian after the bar fight, and Angela Martinez's testimony established that Brian and one of "the twins" were at the hospital with Danny and Monica that night. Furthermore, Angela Martinez told Detective McCaskill that Monica had left the hospital with the twin and had additionally identified Issac's car as the car in which Monica had ridden. Angela's own testimony was that the twin left in a black Nissan.

Randy and Angela Buxton also testified about a cell phone call made by Angela Martinez to Angela Buxton that night in which Martinez stated that Randy was going to die. This testimony corroborated Monica's claim that there was a plan to go to Jesse's house and commit a shooting.

There was also ample testimony about Issac's car being the one involved in the drive-by shooting. Detective McCaskill's testimony about the police report that Issac had filed four days before the shooting established that Issac claimed ownership of a 1990 black Nissan Maxima. Officer Morales's and Detective Iker's testimony was that witnesses at the scene said that a car exactly matching the description of Issac's car—a black early '90s Nissan Maxima—was involved in the shooting.

Additionally, Randy's testimony independently established that Issac's car was the one involved in the shooting. Randy's testimony that he recognized

14

the distinctive tire rims on the car, immediately knew who the car belonged to, and saw Issac driving the car the day after the shooting by itself connected Issac to the shooting. *See Munoz*, 853 S.W.2d at 559.

Even the smallest of details in Monica's testimony were corroborated. For example, Monica's testimony that Issac turned off the car's headlights immediately before Brian started shooting was exactly corroborated by Michelle. Additionally, Monica's testimony that someone fired shots back at the car was corroborated by Officer Morales, who said that Jesse Salinas, Sr. admitted to firing at the car as it sped away.

Forensic evidence also corroborated Monica's story. Michael Ward, the forensic scientist, stated that he determined that the bullets fired toward the house came from a nine-millimeter semi-automatic gun. Monica had stated that Issac gave Brian a semi-automatic. Also, Ward testified that the bullet casings did not have any fingerprints on them, which corroborated Monica's testimony about Brian cleaning them beforehand.

The testimony of Rick Smith and Melissa Lopez additionally corroborated Monica's testimony that, after the shooting, she returned to Issac's apartment where they met up with a lady named Melissa and a man named Rick. Finally, Monica's testimony that she was awakened by the police later that morning was verified by Detective Iker.

15

All of this non-accomplice testimony amounts to at least some evidence tending to connect Issac to the drive-by shooting and murder of Dianette and the associated organized criminal activity offense. *See Solomon*, 49 S.W.3d at 361. The corroboration requirements of article 38.14 were therefore met in this case. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Solomon*, 49 S.W.3d at 361. Accordingly, we hold that the State presented sufficient non-accomplice corroborating evidence to support accomplice Monica Guana's testimony and overrule Issac's sole point.

## IV. CONCLUSION

Having overruled Issac's sole point, we affirm the trial court's judgment.


PER CURIAM

PANEL F:   WALKER, J.; CAYCE, C.J.; and MCCOY, J.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: March 20, 2008

16